In re PAOLI RAILROAD YARD
PCB LITIGATION.

Mabel BROWN
v.
SEPTA, et al.

BURRELL
v.
SEPTA, et al.

CUMMINS
v.
SEPTA, et al.

COHEN & GARON
v.
SEPTA, et al.

THOMPSON
v.
SEPTA, et al.

JONES
v.
SEPTA, et al.

LAMENT
v.
SEPTA, et al.

Christopher BROWN
v.
SEPTA, et al.

Cathlene BROWN
v.
SEPTA, et al.

Craig BROWN
v.
SEPTA, et al.

BARBETTA
v.
SEPTA, et al.

JOHNSON
v.
SEPTA, et al.

Celeste BROWN
v.
SEPTA, et el.

Clemmon BROWN
v.
SEPTA, et al.

Cloyd BROWN
v.
SEPTA, et al.

Curtis BROWN
v.
SEPTA, et al.

INGRAM
v.
SEPTA, et al.

KNIGHT
v.
SEPTA, et al.

NARCISE
v.
SEPTA, et al.

WILLIAMS
v.
SEPTA, et al.

BUTLER
v.
SEPTA, et al.

STANBACH
v.
SEPTA, et al.

CUNNINGHAM
v.
SEPTA, et al.

REID
v.
SEPTA, et al.

Civ. A. Nos. 86–2229, 86–2235, 86–2669,
86–4037, 86–4723, 86–5277, 86–5886, 86–
7414, 86–7415 to 86–7422, 86–7561, 87–
0712, 87–1190, 87–1258, 87–2874, 87–
3227, 87–5269 and 87–5304.

United States District Court,
E.D. Pennsylvania.

Nov. 28, 1988.

Arnold E. Cohen, Charlotte E. Thomas, Klehr, Harrison, Harvey, Branzburg, Ellers & Weir, Joseph C. Kohn, Kohn, Savett, Klein & Graf, D. Bruce Hanes, Philadelphia, Pa., James C. Sargent, Lamb, Windle & McErlane, West Chester, Pa., Geoffrey L. Beauchamp, Wisler, Pearlstine, Talone, Craig & Garrity, Norristown, Pa., Joseph M. Donley and Kenneth A. Roos, Kittredge, Kaufman & Donley, Philadelphia, Pa., for plaintiffs.

Roger F. Cox, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for SEPTA.

David Richman, Pepper, Hamilton & Sheetz, Philadelphia, Pa., for Conrail.

Richard A. Kraemer, Margolis, Edelstein, Scherlis, Sarowitz & Kraemer, Philadelphia, Pa., for Amtrak.

Michael H. Malin, White & Williams, Philadelphia, Pa., for Monsanto.

Harry A. Short, Liebert, Short, Fitzpatrick & Hirshland, Philadelphia, Pa., for G.E.

Denise D. Colliers, Deputy City Sol., Philadelphia, Pa., for City of Philadelphia.

## MEMORANDUM

ROBERT F. KELLY, District Judge.

This memorandum is written in disposition of three summary judgment motions filed by the defendants in these actions.

## FACTS

Since the 1930s, the twenty-three acre Paoli railyard has been a regional maintenance facility for various rail companies. The railyard was owned and operated by the Pennsylvania Railroad and its successor, the Penn Central Transportation Company, until 1976. Defendant Amtrak has owned the site since 1976. Between 1976 and 1983, the facility was operated by defendant, Conrail, as part of the commuter rail service that it operated during this period. Since 1983 defendant SEPTA has operated the railyard.

Throughout this period, the various railroads stored, handled and disposed of PCBs (polychlorinated biphenyls) that were used as dielectric fluid in the transformers on railroad cars. Defendant City of Philadelphia owned some of these railroad cars. Defendant General Electric manufactured and supplied the electrical transformers that contained PCBs. Defendant Monsanto was the only company that produced PCBs for the American market.

SEPTA no longer uses PCB fluid in its railcar transformers. However, the long-term presence and leakage of PCBs at the site caused various levels of PCB contamination at the yard and in the surrounding neighborhoods. The Environmental Protection Agency has implemented temporary measures designed to prevent the migration of PCBs through soil and water into residential and commercial areas adjacent to the yard. At the present time, the area is the site of a Superfund effort pursuant to 42 U.S.C. §§ 9606 and 9607 designed to remove the PCB contamination from the railyard and the surrounding neighborhood.

## PROCEDURAL HISTORY

The plaintiffs in this action have all filed suit seeking "response costs" under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. § 9607(a), which brings this case within the federal question jurisdiction of this court. The plaintiffs in these cases with motions presently before the court have state law personal injury actions as pendent claims. Most of these plaintiffs are or were residents of the neighborhood surrounding the railyard. In three of the cases, workers at the yard or their estates are plaintiffs.

On July 28, 1987, the defendants in this action moved that the court issue a case management order. The defendants argued that all of the plaintiffs had failed to answer expert interrogatories or to provide any discovery to substantiate their claim that PCBs released by the defendants had caused them personal injury. The defendants argued that the discovery process should be held in abeyance until the plaintiffs demonstrated that they had injuries caused by defendants' release of PCBs. The plaintiffs answered that there should be no halt in the general discovery process and that information held by the defendants would be useful to them in proving that defendants caused them injury. On September 24, 1987, the court issued a case management order that allowed the plaintiffs a ninety (90) day period in which to engage in discovery efforts "directed to reveal the quantity and nature of the PCBs used at the Paoli railyard and the health effects on defendants' employees of exposure to PCBs," which information the plaintiffs had asserted would allow their experts to give an opinion as to causation. After that, the defendants were to have ninety (90) days in which to engage in discovery "directed to reveal whether the plaintiffs have suffered personal injury and whether the injury is caused by exposure to PCBs caused by the defendants."

The case management order stated that "all summary judgment motions to be made by defendants are to be filed by April 21, 1988." Because of the plaintiffs' failure to supply all of the discovery by the deadline of the case management order and because the court granted the defendants' motion to allow the deposition of plaintiffs' expert witnesses, this date was extended to July 8, 1988. The purpose of the case management order was to allow the plaintiffs to discover all that they said they needed to know in order to establish causation, to allow the defendants to discover from plaintiffs' experts the basis of their conclusion that defendants' actions caused plaintiffs' injuries, and to allow the defendants to seek summary judgment on the basis that plaintiffs' evidence produced in discovery was insufficient as a matter of law to prove that defendants caused plaintiffs' injuries.

During the period of discovery under the case management order, the parties engaged in numerous disputes over discovery matters and some plaintiffs filed a motion to dismiss without prejudice.

Because which experts a plaintiff has depends on which attorney represents that person, it is convenient to divide the plaintiffs into groups according to who represents them.

In ten cases, plaintiffs are represented by Kohn, Savett, Klein and Graf, P.C. (Harold E. Kohn and Joseph C. Kohn) or Klehr, Harrison, Harvey, Branzburg, Ellers & Weir (Arnold E. Cohen and Charlotte Thomas). In nine of those cases, plaintiffs answered discovery with the reports of three experts:

1) Herbert Allen, Ph.D., a chemist, whose report stated that the area was highly contaminated by PCBs and that there was PCBs in the air and he calculated an amount of PCBs in the air.

2) Deborah Barsotti, Ph.D., a toxicologist, whose report stated general information about PCBs and then concluded that whatever injuries were claimed by plaintiffs to be caused by PCBs were caused by PCBs.

3) Arthur C. Zahalsky, Ph.D., an immunologist, who reported that PCBs caused immune system injuries in these plaintiffs.

In the case of Cunningham v. SEPTA, 87–5269, the expert report was by Harry Shubin, M.D. who reported that a number of diseases of the two persons involved in the case were caused by PCBs.

In the nine cases with D. Bruce Hanes as plaintiffs' attorney, G. John DiGregorio, M.D. reported that the plaintiffs have a fear of future harm and an increased risk of future harm. Dr. DiGregorio also stated that certain laboratory results, such as elevated triglycerides and cholesterol and such complaints as insomnia and irritability, were due to PCBs.

Other plaintiffs made no response to discovery under the case management order.

As contemplated by the case management order, a number of summary judgment motions and answers thereto were filed by the parties and these are listed below:

July 8, 1988 Defendants' Joint Motion for Summary Judgment on Causation

July 8, 1988 Defendants' Joint Motion for Summary Judgment for Failure to Produce Evidence and under the Bar of the Statute of Limitations

July 8, 1988 Motion of Defendant, Septa, for Summary Judgment (Arguing that Pennsylvania law requires notice to a state agency six months after a cause of action accrues.)

August 8, 1988 Answer of William Reid to Motion of SEPTA for Summary Judgment (Case NO. 87–5304 Lamb, Windle & McErlane, P.C., James C. Sargant, Attorney)

August 8, 1988 Response of Plaintiffs to the Defendants' Joint Motion for Summary Judgment and Motion of the Plaintiffs for Leave to Amend their Complaint (*Butler v. SEPTA*, 87–2874, Motion for Failure to Produce Evidence. Wisler, Pearlstine, Talone, Craig & Garrity, Geoffrey L. Beauchamp and Kittredge, Kaufman & Donley. Joseph M. Donley and Kenneth A. Roos, Attorneys.)

August 8, 1988 Plaintiffs' Response to Defendants' Joint Motion for Summary Judgment on Causation (*Butler v. SEPTA*, 87–2874)

August 18, 1988 Defendants' Joint Response to Motion of Plaintiffs for Leave to Amend their Complaint (*Butler v. SEPTA*, 87–2874)

August 22, 1988 Answer of William Reid to Defendants' Joint Motion for Summary Judgment for Failure to Produce Evidence and under the Bar of the Statute of Limitations (87–5304)

August 22, 1988 Plaintiffs' Memorandum in Opposition to Defendants' Joint Motion for Summary Judgment on Causation (Kohn, Savett, Klein & Graf and Klehr, Harrison, Harvey, Branzburg, Ellers and Weir)

August 22, 1988 Plaintiffs' Answer to Defendants' Joint Motion for Summary Judgment on Causation (D. Bruce Hanes)

August 22, 1988 Plaintiffs' Memorandum in Opposition to SEPTA's Motion for Summary Judgment (D. Bruce Hanes)

August 24, 1988 Plaintiffs' Answer to Defendants' Joint Motion for Summary .Judgment for Failure to Produce Evidence and under the Bar of the Statute of Limitations (Kohn, Savett, Klein & Graf and Klehr, Harrison, Harvey, Branzburg, Ellers & Weir)

August 24, 1988 Plaintiffs' Answer to Motion for Summary Judgment of Defendant SEPTA (Kohn, Savett, Klein & Graf and Klehr, Harrison, Harvey, Branzburg, Ellers & Weir)

August 25, 1988 Defendant Monsanto Company's Memorandum in Reply to Plaintiff's Motion to Amend (*Butler v. SEPTA*, 87–2874)

September 2, 1988 SEPTA's Reply Memorandum in Support of its Motion for Summary Judgment

September 9, 1988 Plaintiffs' Surreply Memorandum in Opposition to SEPTA's Motion for Summary Judgment (Kohn, Savett–Klehr, Harrison)

September 15, 1988 Defendants' memorandum in reply to plaintiffs answering memorandum on causation filed (D. Bruce Hanes plaintiffs)

September 15, 1988 Defendants' reply memorandum in support of motion for summary judgment against Plaintiff William Reid (87–5304)

September 15, 1988 Defendants reply brief to plaintiffs' memorandum in opposition to defendants' joint motion for summary judgment on causation (Kohn, Savett–Klehr, Harrison plaintiffs)

September 15, 1988 Defendants' joint motion to strike portions of plaintiffs memorandum in opposition to defendants joint motion for summary judgment on causation (Kohn, Savett–Klehr, Harrison plaintiffs)

September 15, 1988 Defendants' reply to the residential plaintiffs opposition to summary judgment

September 23, 1988 Plaintiffs answer to defendants joint motion to strike portions of plaintiffs' memorandum in opposition to defendants' joint motion for summary judgment on causation (Kohn, Savett–Klehr, Harrison)

September 30, 1988 Plaintiffs' sur-reply brief to defendants' reply brief to plaintiffs' memorandum in opposition to defendants' joint motion for summary judgment on causation (Kohn, Savett–Klehr, Harrison)

## STANDARD FOR GRANTING SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be entered in favor of a moving party where it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The standard for granting summary judgment "mirrors the standard for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In response to a motion for summary judgment, the non-moving party must make a sufficient showing to establish a genuine issue of fact on those elements with respect to which it has the burden of proof. *Celotex Corp.* at 323, 106 S.Ct. at 2553.

Of course, all justifiable inferences must be drawn in favor of the nonmovant, "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513.

■ Summary judgment is not precluded merely because a party has produced an expert to support its position. *Merit Mo-* *tors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 673 (D.C.Cir.1977); *Flegenhauer v. Texaco*, No. 85–3671 slip op. (E.D.Pa. Dec. 1, 1987) [1987 WL 26592] (Ditter, J.) An expert, who brings little more than his credentials and a subjective opinion, will not forestall entry of summary judgment in favor of the defendant. *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 424 (5th Cir.1987); *In re Agent Orange Product Liability Litigation*, 611 F.Supp. 1223, 1258–59 (E.D.N.Y. 1985).

## DISCUSSION

Defendants' motions seek summary judgment on a variety of grounds. SEPTA's motion asserts that Pennsylvania law requires prospective plaintiffs to give a state agency notice of their claim within six months of the cause of action accruing, that these plaintiffs have failed to do so, and that failure to give this notice precludes suit under Pennsylvania law. The defendants filed a motion for summary judgment for failure to produce evidence and under the bar of the statute of limitations. This motion demands judgment against those plaintiffs who failed to produce evidence that defendants' actions caused them injury, and it asserts that discovery produced by some of the plaintiffs indicates that they thought they had been injured by PCBs from the Paoli railyard for as long as six years before they filed suit. The most complex motion is the motion of defendants asserting that no plaintiffs have offered sufficient evidence to prove that defendants caused them injury.

The defendants first address the claims of the plaintiffs who claim they were exposed to PCBs by the defendants because they lived near the railyard—the residential plaintiffs. The defendants assert that the plaintiffs' experts, who had given opinions, did not and could not reasonably dispute the Paoli Exposure Study of the Agency for Toxic Substances and Disease Registry (the ATSDR Study). The ATSDR is charged by law, 42 U.S.C. § 9604(i), with conducting health assessments of waste sites on the National Priorities List. If the

health assessment indicates "a significant increased risk of adverse health effects in humans," the Administration is directed to initiate a health surveillance program for the exposed population.

The ATSDR Study considered the people of the neighborhood according to three variables. The first was where, in the neighborhood, they lived. The neighborhood was divided into three areas according to the topological potential for soil exposure to PCBs from the railyard. The study found that those residents who lived in an area that had more PCBs in the soil did not have any more PCBs in their blood than the other areas.

The second variable was whether PCBs in the blood increased as a function of the number of years spent living in the vicinity of the railyard. The study found no connection.

The third variable studied was whether there was any relation between the amount of PCBs found in a resident's soil and the amount found in his or her blood. In order to make this determination, the study divided the residents of the railyard area into two groups. The first group was a randomly selected group from the neighborhood. The study termed this group the probability selected group. The second group was a group with the highest yard soil concentrations in the neighborhood. The study termed this group the pre-selected group. The study found that the residents with higher PCB levels in their yards did not have significantly higher PCB levels than those that had less.

The study also concluded that the residents' PCB level did not differ significantly from the PCB level borne by the general population. The study stated that the geometric mean serum PCB concentration of populations having no known unusual source of PCB exposure range between 4.2 ppb (parts per billion) and 6.4 ppb. The geometric mean serum PCB concentration, in the probability selected group, was 4.3 ppb and in the preselected group, it was 5.3 ppb. Ninety-seven percent of the probability selected group had serum PCB concentrations of less than 20 ppb compared with 95 percent of the preselected group and 95 percent of the general United States population. The defendants state that all other studies done in the United States of populations living near PCB source sites have produced similar results. The defendants contend that this means that no expert can assert, in accordance with generally accepted scientific standards, that the residential plaintiffs have taken into their bodies PCBs originating at the Paoli railyard.

The defendants further argue that the claims of all the plaintiffs, residential and occupational, are contrary to generally accepted scientific and medical opinion regarding PCBs.

The defendants cite the *Toxicological Profile for Selected PCBs* (draft) (Nov. 1987) prepared by the ATSDR. The *Toxicological Profile*'s Forward states:

This profile reflects our assessment of all relevant toxicological testing and information that has been peer reviewed. It has been reviewed by scientists from ATSDR, EPA, the Centers for Disease Control, and the National Toxicology Program. It has also been reviewed by a panel of nongovernment peer reviewers and was made available for public review. Final responsibility for the contents and views expressed in this toxicological profile resides with ATSDR.

The Toxicological Profile concluded:

Occasional skin irritations, usually acnelike lesions and rashes, and liver effects are the only significant adverse health effects that have been observed in PCB-exposed workers. Workers experience PCB exposures that are much higher than those received by the general public. Adverse health effects have not been observed in people in the United States with nonoccupational exposure.

*Toxicological Profile*, § 1.4 at p. 2. In regard to the liver effects noted among PCB workers, the *Profile* states they "are inconsistent and not clearly associated with clinically detectable liver disease." The inconsistency may be due to the "fact that many of the studies ... did not account for confounding variables." § 4.3.2.1.

In *Human Health Effects of PCBs and PBBs,* 24 American Review of Pharmacology and Toxicology 87 (1987), Dr. Renate Kimbrough of the Center for Disease Control stated:

> In conclusion, various toxic effects of PBBs and PCBs have been described in laboratory animals. In humans, acute poisoning outbreaks have only occurred following exposure to a combination of PCBs and PCDFs. When humans were exposed only to PCBs or PBBs, the only observed acute effects have generally been minor. So far, no significant chronic health effects have been causally associated with exposure to PCBs or PBBS.

*Id.* at 106.

The defendants assembled a panel of medical doctors and scientists [1] with impressive credentials who filed a joint affidavit which states in part:

> We have reviewed the extensive literature on PCBs and have found that no reasonable medical or scientific basis exists for concluding that chronic exposure to PCBs cause cancer, hypertension, cardiovascular diseases, elevations in serum triglycerides or cholesterol levels, liver disease, joint irritation, pancytopenia, post-operative humans.

Defendants contend that nothing in the scientific literature, as generally accepted by the standards of the scientific community, contradicts any of these conclusions, so the plaintiffs are out of court.

The defendants mean to exclude, by the phrase "generally accepted by the scientific community," studies in two categories: (1) animal studies and (2) studies resulting from the Yusho and Yu Cheng incidents.

Rule 703 of the Federal Rules of Evidence controls the issue of what an expert is allowed to use as a basis for testimony. This Rule states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before

1. Harris Busch, M.D., Ph.D., director of the Cancer Research Program, Chairman of the Department of Pharmacology, and Professor of Medicine at Baylor College of Medicine, M.D. from the University of Illinois, Ph.D. from the University of Wisconsin in Biochemistry; Peter A. Cassileth, M.D., attending physician at the Hospital of the University of Pennsylvania, associate director of the University of Pennsylvania Cancer Center, Professor of Medicine, Department of Medicine, University of Pennsylvania, M.D. from Columbia University; Jordan N. Fink, M.D., Professor of Medicine and Chief of the Allergy–Immunology Section of the Medical College of Wisconsin at Milwaukee, fellow and past president of the American Academy of Allergy and Immunology, M.D. from the University of Wisconsin Medical School; S. Alf Fischbein, M.D., Associate Professor, Division of Environmental and Occupational Medicine at the City University of New York, M.D. from the University of Land, Sweden; Gio Batta Gori, director of the Health Policy Center, doctorate in biological sciences, University of Camerina, Italy and a Master of Public Health degree from Johns Hopkins University; Raymond D. Harbison, Ph.D., director of Interdisciplinary Toxicology at the Center for Environmental Toxicology, and Professor of Pharmacology in the School of Medicine at the University of Florida, Ph.D. in Pharmacology/Toxicology from the University of Iowa; Rudolf John Jaeger, Ph.D., Principal Scientist and President of Environmental Medicine, Inc. a clinical consulting practice in toxicology, research professor of Environmental Medicine at the New York University Medical Center Institute of Environmental Medicine and Visiting Lecturer on Occupational and Environmental Toxicology in the Department of Environmental Health Sciences and Physiology at the Harvard University School of Public Health, Ph.D. in biochemical toxicology from Johns Hopkins University School of Hygiene and Public Health; Jack S. Mandel, Ph.D., M.P.H., Associate Professor in the Division of Environmental Health at the School of Public Health, University of Minnesota and Instructor at the Midwest Occupational Health Institute at the University of Minnesota, M.P.H. in epidemiology from the University of Minnesota and Ph.D. in epidemiology from the University of Minnesota; Robert Wilson Morgan, M.D., S.M.Hyg., President and Senior Physician Epidemiologist at Environmental health Associates, M.D. from the University of British Columbia and S.M. Hyg. in epidemiology from the Harvard University School of Public Health; Stanley M. Pier, Ph.D., Associate Professor of Occupational Health and Aerospace Medicine at the University of Texas Health Science Center at Houston, School of Public Health, Ph.D. in Organic Chemistry, Theoretical Physics and Inorganic Chemistry from Purdue University; William Joseph Waddell, M.D., Professor and Chairman of the Department of Pharmacology and Toxicology at the University of Louisville, M.D. from the University of North Carolina; Robert H. Waldman, M.D., Dean of the Department of Medicine, University of Nebraska, M.D. from the Washington University Medical School.

the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

This Rule was interpreted by the Third Circuit Court of Appeals in the case *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238 (3d Cir.1983). Factually, that case was very different from this litigation, however, it is the leading case in the Third Circuit on the issue of what constitutes a sufficient basis for an expert opinion. The court held: "The proper inquiry is not what the court deems reliable, but what experts in the relevant discipline deem it to be." *Id.* at 276. The trial court had excluded expert opinions of economists because they were based on data that were found to be inadmissible and unreliable. The Court of Appeals stated: "There are in the record unequivocal and uncontradicted affidavits from each of the experts that the data they relied on in forming their opinions were of a type reasonably relied upon by experts in their respective fields." *Id.* However, that is not the situation in the case now before the court. In this case, the defense experts unequivocally contradict the proposition that the results of animal studies can ever be the basis of a finding that a disease of a particular human being is more likely than not caused by a particular chemical. The defendants argue that animal studies are an appropriate method for regulatory agencies to determine whether or not there is any risk that a particular chemical might be a threat to public health but they are totally irrelevant in a tort case where the question is whether it is more likely than not that defendant caused plaintiff's injury.

There are federal court cases on both sides of the question whether an expert should be permitted to testify as to the cause of human illness based upon the results of animal tests. The case of *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1221 (E.D.N.Y.1985) is factually similar to this case because it involved experts willing to testify to the harmful effect of a chemical in the face of epidemiological studies that fail to show that harmful effect. In that case, Chief Judge Weinstein held that: "The animal studies are not helpful in the instant case because they involve different biological species. They are of so little probative force and are so potentially misleading as to be inadmissible. *See* Fed.R.Ev. 401–403. They cannot be an acceptable predicate for an opinion under Rule 703."

In the recent case of *Richardson v. Richardson–Merrell, Inc.,* 857 F.2d 823 (D.C.Cir.1988) the circuit court affirmed the granting of judgment n.o.v. to the defendant drug company where the plaintiffs alleged that the drug Bendectin caused the minor plaintiff's birth defects. The court held that a jury verdict could not be reasonably based on the opinion of a medical doctor and former professor of pediatrics, pharmacology and toxicology who stated that the birth defects were caused by Bendectin and that his opinion was in turn based upon study of chemical structure, *in vitro* studies of the effect of Bendectin on animal tissues, and studies showing Bendectin caused birth defects in animals, even though he was an expert and stated that the epidemiological studies were "defective, inconclusive or both." This is very similar to what plaintiff's experts say about the PCB epidemiological studies. Both the District Court and Court of Appeals found conclusive the testimony of the defense expert that the epidemiological evidence showed Bendectin did not cause birth defects. The District Court, 649 F.Supp. 799 (1986) found there was a scientific consensus that Bendectin has not been shown to cause birth defects, and stated:

That Dr. Done remains an unbeliever and was willing to testify to his disbelief "with reasonable medical certainty" does not mandate that this case be left as the jury decided it. Without a genuine basis "in or out of the record," even his expert "theoretical speculations" are insufficient to sustain the plaintiff's burden of proving, by a preponderance of the evidence, that Bendectin not only causes congenital defects generally, but that, in particular, it caused those limb reduction

defects with which Carita Richardson was most unfortunately born.

649 F.Supp. at 803, quoted by the Court of Appeals, 857 F.2d at 827. The court thus found that plaintiff's experts' disagreement with the epidemiological studies was not a sufficient basis for a verdict. There are a number of other cases that come to a similar conclusion regarding the admissibility of expert testimony based on animal studies, for example, *Viterbo v. Dow Chemical Co.*, 826 F.2d 420 (5th Cir.1987) and *Lynch v. Merrel–National Laboratories*, 646 F.Supp. 856 (D.Mass.1986).

To be sure, there are cases on the other side of this issue: *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529 (D.C.Cir.), *cert. denied* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984); *Wells v. Ortho Pharmaceutical Corp.*, 788 F.2d 741 (11th Cir.1986); *Villari v. Terminix International, Inc.*, 663 F.Supp. 727 (E.D.Pa.1987) and slip. op. (August 9, 1988); *Ramirez v. Richardson–Merrell, Inc.*, 85–1504 (E.D.Pa. September 4, 1986) [1986 WL 9724]; *Lanzilotti v. Merrell Dow Pharmaceuticals, Inc.*, 82–0183 (E.D.Pa. July 10, 1986) [1986 WL 7832].

■ The first question is whether the court is permitted to look behind the experts' statements that animal studies are the sort of data on which they would rely in determining what causes a disease in the practice of their profession, or whether the court is bound by the assertions of plaintiffs' experts. If Rule 703 is to be any limit on the ability of expert witnesses to give their opinions, a court must be permitted to examine the bases of the proffered opinions. Otherwise any case in which an expert was willing to use two sets of magic words would always survive motions for summary judgment and directed verdict. As long as the expert was willing to say "to a reasonable degree of scientific certainty" and "the basis of my opinion is X, on which experts in my field reasonably rely," every case requiring expert testimony would get to the jury. If a court is not permitted to examine the basis of an expert's opinion in order to rule on the admissibility of that opinion, then Rule 703 should read: "An expert may cite as the basis of his opinion anything he likes."

■ The next question is whether animal studies are a proper basis for the diagnosis of the cause of a disease. This case is not like the *Japanese Electronic Products* case in which plaintiffs' experts said their data was reliable without contradiction; here we have very convincing evidence on the record that says that these studies are irrelevant. Therefore, relying on the reasoning of the *Agent Orange* and *Richardson v. Richardson–Merrell, Inc.*, I find that the expert opinions based on animal studies are inadmissible.

■ The next question is whether expert opinions based on studies of the Yusho and Yu Cheng incidents should be admitted. The Yusho and Yu Cheng incidents occurred in Japan and Taiwan in the late 1960s. In each of these incidents, rice oil was contaminated with a Japanese brand of PCBs. The people who ate food cooked with this rice oil got various diseases. Defendants argue that it is bad science, and therefore inadmissible evidence, to base conclusions regarding the health of our plaintiffs on what happened to these people. It does seem clear that the consensus conclusion from the scientific literature is that the diseases that occurred in the victims of these incidents were caused by the ingestion of highly toxic PCDFs with their food and is not evidence of the effects of PCBs. Therefore, for the same reasons as addressed above regarding animal studies, I will exclude from evidence any expert opinion based on studies of the Yusho or Yu Cheng incidents.

Defendants next argue that the rules of evidence preclude the admission of the testimony of plaintiffs' experts.

First, defendants argue that Rule 703 precludes admission of the testimony. Rule 703 allows the admission of expert testimony if it is "helpful" to the factfinder.

Defendants cite the case of *Viterbo v. Dow Chemical Co.*, 646 F.Supp. 1420 (E.D. Tex.1986) *aff'd* 826 F.2d 420 (5th Cir.1987). In that case, the plaintiff claimed that a

certain chemical caused him injury. In answer to a motion for summary judgment, an osteopath testified that the chemical did indeed cause plaintiff's injuries. The trial court excluded the testimony and granted summary judgment for the defendant. In justifying its examination of whether the scientific evidence he claimed to be relying on actually supported the expert's opinion, the court stated:

A vigorous examination is especially important in the toxic tort context, where presentation to the trier of theories of causation depends almost entirely upon expert testimony. This examination is required because courts have afforded experts wide latitude in picking and choosing the sources from which to base opinions. Rule 703 nonetheless requires court to examine the reliability of those sources.

If the underlying data is so lacking in probative force and reliability that no reasonable expert could base an opinion on that data, then an opinion that rests entirely upon that data must be excluded.

646 F.Supp. at 1424 (citations omitted).

In affirming, the Court of Appeals stated:

"This opinion [from plaintiff's osteopath] simply lacks the foundation and reliability necessary to support expert testimony. As an unsupported opinion, it does not serve the purposes for which it is offered, that is, objectively to assist the jury in arriving at its verdict.... Indeed [the osteopath's] testimony is no more than Viterbo's testimony dressed up and sanctified as the opinion of an expert. Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible. The district court properly excluded and granted summary judgment for Dow."

826 F.2d at 424.

Consideration of the statement of the Seventh Circuit, "there is not much difficulty in finding a medical expert witness to testify to virtually any theory of medical causation short of fantastic," *Stoleson v. United States*, 708 F.2d 1217, 1222 (7th Cir.1983), leads to the conclusion that this view of Rule 703 has much to recommend it.

Epidemiological studies are studies of large numbers of humans exposed to some chemical in order to determine if they are more likely to get a particular disease or diseases than people not so exposed. The defendants contend that no peer-reviewed epidemiological study shows anything more than chloracne or liver effects for any human population and no health effects at all except for people heavily exposed at work. The plaintiffs' experts ignore human epidemiological studies, the findings of government and other general evaluations of the dangers of PCBs and the ATSDR Study and epidemiological studies of Paoli workers. The defendants contend that to admit such testimony is to admit testimony that is "unhelpful" because it is unreliable.

Defendants also argue that the testimony should be excluded under authority of Rule 403 which states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The defendants point out that the only reason a jury would have for believing the plaintiffs' experts is that they have impressive academic degrees, will use long words in their testimony and will speak in a believable manner, because there is very little scientific support for their views.

Even if I found that plaintiffs' experts testimony reached the level of being probative, I would rule to exclude it on the basis of Rule 703 and 403 as "unhelpful" and more prejudicial than probative. *See, In re "Agent Orange"*, 611 F.Supp. at 1256.

We shall consider plaintiffs' experts using the standards set forth above.

■ The "medical" experts for the Klehr, Harrison and Kohn, Savett clients are Deborah Barsotti, Ph.D. and Arthur C. Zahalsky, Ph.D. Deborah Barsotti is a toxicologist who works for the ATSDR in Georgia. She states that to "a reasonable

scientific certainty" many disparate diseases that plaintiffs, in nine of these cases, have are caused by PCBs. Often she has no support from scientific literature to point to in regard to a specific disease. She finds PCB caused hypertension and asthma even in people who have family histories of hypertension and asthma. She finds that PCBs caused the plaintiffs emotional distress, despite the fact that her area of expertise has nothing to do with emotional diseases and she has only talked to one of the plaintiffs. She claims that, by studying the plaintiffs medical histories, she has excluded other causes of these diseases, but she is not a medical doctor and is not trained in differential diagnosis.

Dr. Barsotti also claims that she has "traced" the PCBs in the plaintiffs bodies to the Paoli railyard by examining them chemically. Because Dr. Barsotti is not a chemist, I find this conclusion beyond the scope of her expertise and rule that it is inadmissible.

Arthur C. Zahalsky teaches nursing undergraduates at a college in Illinois and owns a immunological consulting firm called Immunox, Inc. His answer to the question of whether he is functionally interchangeable with Immunox is, "If you wish." Zahalsky has no graduate course credits in immunology, but bills himself as an immunologist. He says that he knows that PCBs cause damage to the immune system and that tests on these plaintiffs would prove it, but that these tests have not been done. He says that the diseases that the plaintiffs have are caused by damage to their immune system, but he is not trained in differential diagnosis.

G. John DiGregorio, M.D. is the expert in the D. Bruce Hanes cases. His plaintiffs are mostly healthy but he does diagnose a couple of diseases as probably caused by PCB exposure. He does not attempt to provide a differential diagnosis, however. Most of Dr. DiGregorio's opinion is that PCBs have caused his plaintiffs anxiety, fear of future harm and a possibility of future harm. Defendants assert that Dr. DiGregorio's deposition shows the basis of his opinion to be his personal opinion

and feeling that PCBs are dangerous, and he admits that the epidemiological evidence is against him.

Harry C. Shubin, M.D., is the plaintiffs' expert in the *Cunningham* case. He examined the two plaintiffs in this case in 1986. He gives his opinion that diseases in both plaintiffs were caused by PCBs but he has no scientific or medical support for these conclusions. He has not reviewed the ATSDR Study, the ATSDR Toxicological Profile on PCBs or any epidemiological study.

Defendants also attack the report of Herbert Allen, Ph.D., a chemist who calculated an amount of PCBs in the air in the area of the railyard based on the amount of PCBs in the soil. Defendants cite affidavits of their own experts that such a calculation is not scientifically reliable, that any finding regarding how much PCBs are in the air must be based on actual measurements, and that the actual measurements that were taken showed an amount much lower than plaintiffs' expert calculated.

Defendant's final point is that those plaintiffs who do not point to some present disease cannot recover under any circumstances under Pennsylvania law.

In the case of *Martin v. Johns–Manville Corp.*, 508 Pa. 154, 494 A.2d 1088 (1985) the Pennsylvania Supreme Court considered the issue of whether a doctor should be permitted to testify that a plaintiff exposed to asbestos and suffering from asbestos related disease might have an undiscovered cancer caused by asbestos at the time of trial and certainly faced an increased risk of developing cancer. The testimony proffered in this case to prove risk of future harm is no stronger, and is in fact strikingly similar, to the testimony rejected by the Pennsylvania Supreme Court. 508 Pa. 164–65, 494 A.2d 1093–94.

In *Berardi v. Johns–Manville Corp.*, 334 Pa.Super. 36, 44–45, 482 A.2d 1067, 1072 (1984) the plaintiff was a woman who feared the future health effects of her asbestos exposure. Her husband worked with asbestos and, it was claimed, undoubtedly brought asbestos fibers home with

him on his clothes which she was exposed to while laundering them. She had no physical symptoms but it was alleged that she "is waiting for an inevitable process to occur to render her injuries noticeable on an x-ray." The court held that, without any evidence of present injury, she was without a cause of action. The Superior Court in *Cathcart v. Keene Industrial Insulation,* 324 Pa.Super. 123, 151–53, 471 A.2d 493, 508 (1984) considered and rejected a similar claim.

In *Houston v. Texaco, Inc.,* 371 Pa.Super. 399, 404, 538 A.2d 502, 504 (1988) the Superior Court held that plaintiffs could not recover for emotional distress absent some physical injury. In that case, gasoline from storage tanks leaked into the plaintiffs' well. Plaintiffs alleged that this caused them emotional distress, and the Superior Court held that they were without a cause of action.

Plaintiffs' attorneys have filed a number of answers to this motion for their respective clients. Most important is the answer filed for the Kohn, Savett and Klehr, Harrison plaintiffs, a 137 page brief supported by two volumes of appendices. Its most striking feature is referance to affidavits of four experts who had never been heard from in this litigation prior to the filing of this answer.

■ The defendants have filed a joint motion to strike this part of the plaintiffs' response on the ground that adding the testimony of additional experts at this point in the litigation is a violation of the case management order. The clear purpose of the case management order was to allow the defendants to discover what the plaintiffs' experts' opinions were before they filed their summary judgment motions. Authority exists for refusing to consider these untimely affidavits. *In re "Agent Orange",* 611 F.Supp. at 1243. However, I will consider these late affidavits because of the policy of the Federal Rules of Civil Procedure that cases should be decided on the merits where possible.

■ Ian C.T. Nesbit received his Ph.D. degree from Cambridge University in physics in 1958 and is a "professional environmental scientist." Dr. Nesbit does not seem to have formally studied anything thereafter but has published and worked in "environmental science" since the early 1970s.

Dr. Nesbit gives conclusions in a number of areas. First, he says that the ATSDR Study's finding, that the neighbors of the Paoli railyard had the same "background" amount of PCBs in their bodies as the general population, is seriously mistaken because the ATSDR had the wrong figures for what the background exposure is. Dr. Nesbit claims that the only systematic survey of levels of PCBs in the general population in the United States was the National Human Adipose Tissue Survey (NHATS) conducted by the Environmental Protection Agency from 1970 to 1983. Adipose tissue is fat tissue where PCBs tend to accumulate in the body. Dr. Nesbit claims that it is possible to calculate how much PCB is in the fat from how much is in the blood. Most plaintiffs have had PCB blood tests, only a few have had PCB adipose tissue tests. The ATSDR report relied on blood tests not adipose tissue tests. Dr. Nesbit says that if you take the blood test results of the plaintiffs and the people in the ATSDR and you use his formula to calculate what their adipose tissue PCB content is, you will get a result that is much higher than the general background found in the EPA adipose tissue study.

Dr. Nesbit also states that the authorities cited by the defendants are wrong when they say that PCBs have not been shown to be dangerous. He states that there is some evidence in the human studies of bad health effects from PCBs. He also vigorously defends the use of animal studies. He says, "a balanced assessment of the effects of a chemical, such as PCBs, would include weighing the results of less-than-conclusive human studies with those of more rigorously-controlled animal studies." Affidavit at 24.

Dr. Nesbit also attacks the ATSDR Study in more general terms.

■ These plaintiffs also produce the affidavit of Robert K. Simon, Ph.D., an

industrial hygienist, toxicologist and forensic analytical chemist. Dr. Simon says that scientific techniques would allow a chemist to test the PCBs in a person and decide whether they came from the environment in general or from a specific source. Dr. Simon also attacks the ATSDR Study.

The plaintiffs summarize the attacks of Dr. Nesbit and Dr. Simon on the ATSDR Study as follows:

1. The conclusion that the Paoli Residents (non-plaintiffs) show exposures typical to the general U.S. population is flawed in that it incorrectly cites the background level as up to 20 ppb. The average level of PCBs in blood is now well below 3 ppb and 5 ppb represents the 95 percentile. The report fails to take account of the recent evidence.

2. ATSDR did not attempt to measure exposure in any way, such as through PCB levels in the soil of residences of the study population. Nor did it attempt to correlate blood levels of PCBs with soil levels of the selected subgroup of 34 individuals with putatively high exposure.

3. ATSDR did not include questions in their occupational/residential questionnaire about contact with the soil or other factors leading to exposure.

4. ATSDR did not focus on children, although children are generally considered to be at greatest risk of injury from exposure to PCBs.

5. ATSDR did not establish a "control" group or population comparable to the study group with the exception of residents near a highly contaminated PCB site.

6. The main comparison by ATSDR was of two groups: a "probability group" and a "preselected group." No attempt was made to correlate PCB levels of the soil with PCB levels of the probability group. Thus, the degree of difference in potential exposure is mere conjecture.

7. ATSDR excluded from the probability group individuals also in the preselected group. Thus the probability group was no longer a random sample.

8. ATSDR negated a result of near statistical significance of PCB levels by excluding from the preselected group one individual with high PCB levels.

9. When correcting the miscited background PCB levels of the general population, the Paoli residents' "geometric mean is 50 times greater than background. The individuals tested with levels greater than 20 ppb and e.g. 77 ppb are evidence of serious exposure." Affidavit of Simon at 6.

Dr. Simon does not give a basis for his statement that the background PCB blood burden can be calculated from the NHATS. Drs. Simon and Nesbit evidently believe that their blood to adipose tissue formula is over the number of studies that defendants' cite that indicate a PCB blood background amount directly by measuring it. However, the only reason they give for not believing them is that the NHATS is more recent. However, the NHATS ended in 1983 and some of the defendants' studies are more recent than that. Neither doctor cites any study that measured PCBs in the blood directly or cites a basis for calculating blood burden from adipose tissue burden. Further, there are some plaintiffs in our case who have had both blood tests and adipose tissue tests and they do not reflect the 220 to 250 times relationship that these experts claim. I feel compelled to note further that I see nothing in Dr. Nesbit's curriculum vita that would qualify him to testify as an expert in this area.

I hold that plaintiffs have failed to show that they have been more heavily exposed to PCBs than the general population and therefore there is no basis for concluding that the source of their PCB body burden is the Paoli Railyard.

I do not find that their complaints regarding the ATSDR study lead to the conclusion that any of the plaintiffs have been exposed to PCBs from the railyard, or that the conclusions of the ATSDR study are incorrect.

■ Plaintiffs also present the affidavit of William J. Nicholson, Ph.D. who is Professor of Community Medicine in the Division of Environmental and Occupational Medicine of Mount Sinai, New York, New

York. Dr. Nicholson received a Ph.D. in physics with a minor in physiology and biophysics. Among the things he has done at Mt. Sinai is directing industrial hygiene studies and conducting epidemiological studies.

Dr. Nicholson states that in December 1987, he wrote a study for the Ontario Ministry of Labor that was published and widely distributed. Dr. Nicholson states that this article was a study of the data of all the PCB worker epidemiological studies that had been published. Dr. Nicholson came to the conclusion that there was "substantial evidence for a causal association between excess risk of death from cancer of the liver, biliary tract, and gall bladder and exposure to PCBs."

Dr. Nicholson's study is what is called a "meta-analysis." Defense experts state that "meta-analysis" is a novel scientific technique in which data from a number of different epidemiological studies are put together and then analyzed again to see if any positive results are obtained. Dr. Nicholson assembled the data from all of the epidemiological studies of PCBs, none of which independently showed any connection between PCBs and cancer and came to his conclusions.

In this circuit, the admissibility of expert testimony based on novel scientific techniques is controlled by the case of *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985). In that case the court stated:

> In our view, Rule 702 requires that a district court ruling upon the admission of (novel) scientific evidence, i.e., evidence whose scientific fundaments are not suitable candidates for judicial notice, conduct a preliminary inquiry focusing on (1) the soundness and reliability of the process or technique used in generating the evidence, (2) the possibility that admitting the evidence would overwhelm, confuse, or mislead the jury, and (3) the proffered connection between the scientific research or test result to be presented, and particular disputed factual issues in the case.

*Id.* at 12137. In my view all three of these factors militate against admitting this testimony. The reports of defendants' experts advance convincing reasons why meta-analysis as a technique, and this meta-analysis in particular, is not reliable. Dr. Nicholson's report has not been peer-reviewed or accepted by anybody in particular, even the Ontario Ministry of Labor. There is a possibility that Dr. Nicholson's testimony would confuse the jury because of its scientific nature and his credentials so they would make more of it than it actually deserved.

 The third factor is the most influential in this determination. The conclusion of Dr. Nicholson's report is that there was "substantial evidence for a causal association between excess risk of death from cancer of the liver, biliary tract and gall bladder and exposure to PCBs." None of our plaintiffs have cancer of the liver, biliary tract or gall bladder. Dr. Nicholson's report could not be the basis for anyone to say with reasonable degree of scientific certainty that some particular person's disease, not cancer of the liver, biliary tract or gall bladder, was caused by PCBs.

In fact, even if Dr. Nicholson's testimony was admissible despite being a novel scientific technique, it would be difficult to understand how it was relevant.

Dr. Nicholson states that his article was overlooked by the defendants' panel of experts. The plaintiffs argue that this is evidence of a lack of credibility on their part. Defendants reply that their experts claimed to have reviewed every peer-reviewed published epidemiological study and that Dr. Nicholson's article was not peer-reviewed, was not published in a scientific study.

 Plaintiffs' final new expert is a medical doctor, Benjamin Calesnick, M.D., director of the Division of Human Pharmacology at Hahnemann Medical College. Dr. Calesnick provides a two page affidavit which states that he has experience treating persons exposed to PCBs, that he has performed physical examinations on some of the plaintiffs and concludes: "To a reasonable degree of medical certainty, these plaintiffs have been exposed to PCBs, there is a potential for them to sustain injuries

from PCB exposure, if they have not already sustained these injuries, and there is a need for early detection and treatment of these PCB induced injuries for plaintiffs." This seems to be strikingly similar to the opinion offered in *Martin v. Johns Manville Corp.* and ruled inadmissible by the Pennsylvania Supreme Court. Because that was an asbestos case, and it has been epidemiologically proved that asbestos exposure can cause cancer, that doctor might have had more of a basis for his opinion.

The answer of the plaintiffs also includes a further affidavit from Dr. Zahalsky, the immunologist. Dr. Zahalsky states that he has had tests done on some of the plaintiffs and these tests show that some of the plaintiffs show immunologic abnormalities by certain indices. This affidavit, however, adds nothing to the statements of Dr. Zahalsky already on the record. Dr. Zahalsky's statement is insufficient to indicate that these "abnormalities" are legally cognizable injuries. More important, although Dr. Zahalsky asserts that these abnormalities are caused by PCBs, there is nothing to show that he considered and eliminated any other causes of the "abnormalities" other than PCBs or, indeed, that he is qualified to give a diagnosis of their cause.

■ The answer of these plaintiffs makes a number of other points. Frequently and indignantly, it is insisted that PCBs really are dangerous. Numerous sources and studies are cited and its hard to keep them straight. Courts in regulatory cases are quoted; congressmen in debate are quoted; animal, Yusho and Yu Cheng studies are quoted; studies of unknown origin are quoted; and the Nicholson study is quoted frequently. While all this contradicts the authorities the defendants quote, it does not prove causation of the variety of different diseases that the plaintiffs claim. Proving PCBs are generally dangerous proves nothing. Plaintiffs must prove that it is more likely than not that PCBs from defendants are the cause of the injuries they claim.

The plaintiffs make spirited defense of the use of animal and Yusho and Yu Cheng studies as a proper scientific basis for their experts' opinions.

The plaintiffs also supply an affidavit from Dr. Herbert Allen, the chemist who calculated how much PCB was in the air in the area. He states that although it might not be true at any given moment, if the ground contains one hundred times the background level of PCBs, the air, on average, contains one hundred times the background level of PCBs.

Plaintiffs make much of the fact that they have an affidavit from one of defendants' experts in another case from 1980 that says that animal studies show that chlorinated hydrocarbons and other chemicals, not PCBs, are dangerous. That was a case where the government was seeking injunctive relief trying to get a waste site cleaned up. The expert was giving animal studies as a reason for this. He was using animal studies in support of a regulatory decision. He was not saying that animal studies gave him the scientific basis for saying that it was more likely than not that a particular person has come down with a particular disease because of exposure to a particular chemical.

In disputing the defendants' attacks on their experts, the plaintiffs cite the case of *Osburn v. Anchor Laboratories, Inc.*, 825 F.2d 908, 914 (5th Cir.1987) *cert. denied sub. nom Rachelle Laboratories, Inc. v. Osburn*, —— U.S. ——, 108 S.Ct. 1476, 99 L.Ed.2d 705 (1988). In that case, defendants argue that plaintiff's expert's testimony on causation was insufficient to prove that chloramphenicol caused plaintiff's leukemia. Defendants argued that there was no generally accepted theory in the medical community that chloramphenicol could cause leukemia without first causing aplastic anemia, and plaintiff had not been diagnosed with aplastic anemia. The court stated:

> This argument missed the point. An expert's opinion need not be generally accepted in the scientific community before it can be sufficiently reliable and probative to support a jury finding ... What is necessary is that the expert arrived at his causation opinion by relying upon

*methods* that other experts in his field would reasonably rely on in forming their own, possibly different opinions, about what caused the patient's disease ... Thus medical expert opinion testimony that is controversial can support a jury finding of causation as long as the doctor's conclusory opinion is bases upon well-founded methodologies....

*Id.* at 915 (citations omitted).

Plaintiffs conclude that: 1) there are PCBs present in Paoli; 2) that plaintiffs have PCBs in their bodies; 3) that plaintiffs have illnesses known to be caused by PCB exposure; 4) that plaintiffs have filed reliable expert opinions.

In the answer on behalf of the D. Bruce Hanes plaintiffs, the defendants' interpretation of the Pennsylvania cases requiring an injury before recovery in toxic tort litigation is disputed. These plaintiffs assert that a cause of action requires "some physical injury or some medically-identifiable effect" and that the fact that they have PCBs in their body is a "medically-identifiable effect." *Cathcart v. Keene*, 324 Pa.Super. at 152, 472 A.2d at 508. Plaintiffs argue that, if the purpose of this requirement is to prevent fraud or recovery for illusionary fears, that purpose is fulfilled by requiring that they demonstrate that their bodies contain PCBs before allowing them to recover for fear of future harm.

The plaintiffs argue that Dr. DiGregorio's opinion, that PCBs can cause cancer of the liver and other diseases, is sufficient to defeat defendants' summary judgment motion on the issues of whether plaintiffs should recover for the risk of future harm. However, asbestos causes cancer and recovery for risk of future harm was not permitted by the Pennsylvania Supreme Court in *Martin v. Johns–Manville.*

█ I believe that to make out a case the plaintiffs would need to prove four elements: 1) that defendants released PCBs into the environment; 2) that plaintiffs somehow ingested these PCBs into their bodies; 3) that plaintiffs have an injury; 4) that PCBs are the cause of that injury.

The plaintiffs have no problem with the first element.

It is the second element that is implicated by the wrangling over the question of whether there was enough PCBs in the air around Paoli for the plaintiffs to have ingested it by breathing. This dispute is irrelevant.

Either plaintiffs are right and they have more PCBs in their bodies than the rest of us, or defendants are right and they do not. If they do have an unusually high amount of PCBs, circumstantial evidence indicates where they come from.

However, the only legally admissible evidence in this case is that they do not. The plaintiffs have certainly failed to carry their burden to prove that they do. For the reasons discussed above, plaintiffs evidence to the contrary is inadmissible. Since the plaintiffs cannot demonstrate that they have been more heavily exposed to PCBs than the general population, they cannot recover.

█ Regarding the third issue, plaintiffs must point to some health problem that they have or they are out of court under Pennsylvania law. If the best they can do is possibility of future harm, fear of future harm, emotional distress, or the mere fact that they have PCBs in their body, then those plaintiffs cannot recover. The expert testimony we have regarding the possibility of future harm is insufficient for the Pennsylvania Supreme Court.

The fourth issue contains a number of subheadings.

First, there is the issue that the defendants heavily emphasize, that plaintiff's experts' opinions are not admissible because they are not sufficiently scientifically reliable. I have ruled that they are not admissible and

Second, there is the question of whether the plaintiffs' experts really are experts. Many of them seem to have very little formal academic training in the areas in which they testify. Although defendants often attack the experts, they do not do so systematically and provide no law on the

question; therefore, this issue will not be considered.

■ Third, there is the lack of differential diagnoses. For example, an expert will claim that the plaintiff has asthma and that asthma is caused by PCBs to a reasonable degree of medical or scientific certainty; but when asked how he knows that the asthma is not caused by one of the other causes of asthma that produce asthma even in people who are not exposed to PCBs, the expert has no intelligible response. I think that this is fatal to the plaintiffs claim. See *In re "Agent Orange,"* 611 F.Supp. at 1250 to 1254. It is relevant to note that the plaintiffs' experts who are medical doctors do not purport to make differential diagnoses; the only experts who make the attempt are Ph.D.s. It is significant that the Klehr, Harrison–Kohn, Savett plaintiffs now have an M.D. testifying for them, but he is unwilling to say that any particular disease the plaintiffs have is cause by PCBs, just that they should be regularly checked because of the possibility of future harm. The plaintiffs call this a "medical monitoring claim." However, this claim is barred because the testimony of Dr. Calesnick and the other plaintiffs' experts who testify regarding the risk of future injury is insufficient to support it under Pennsylvania law.

■ Defendant Septa has filed a motion for summary judgment based on 42 Pa.C.S.A. § 5522 which requires that any person "who is about to commence any civil action" against a "government unit" or "Commonwealth agency" must file with the agency a statement with information about the claim within six months of the time or that claim is barred. Septa has been held to have the benefit of this act by Pennsylvania courts. *Feingold v. Septa,* 512 Pa. 567, 517 A.2d 1270 (1986); *Graffigna v. City of Philadelphia,* 98 Pa.Cmwlth. 624, 629 512 A.2d 91, 92 (1986).

The plaintiffs' most significant reply is that their causes of action accrued before these cases were decided and that therefore these holdings should not be applied to their cases retroactively.

However, these opinions did not make new law, they merely interpreted Pennsylvania statutes; therefore, applying their holdings to the plaintiffs is not applying anything retroactively. Any state law claims in any case in which plaintiffs did not file a statement within six months of their claimed injury accruing is barred by this statute. FELA claims against Septa are not barred by this statute.

Defendants have also moved for summary judgment against a few of the plaintiffs on the grounds of the statute of limitations. Defendants allege that reports from psychologists indicate that these plaintiffs sought psychological help outside the period of the statute of limitations because they thought they were injured by PCBs emanating from the Paoli Railyard. Because of my decision regarding the other summary judgment motions, I will not decide this motion.

### ORDER

AND NOW, this 28th day of November, 1988, upon consideration of the Motions for Summary Judgment of the Defendants and all the responses filed in opposition thereto, it is hereby ORDERED and DECREED that said Motions are GRANTED and Summary Judgment is entered in favor of the Defendants and against the Plaintiffs on the Plaintiffs' personal injury claims in all of the above captioned cases.