**Jules R. VITERBO, et ux, (Patricia Viterbo), Plaintiffs-Appellants,**

v.

**The DOW CHEMICAL CO., Defendant-Appellee.**

**No. 86–2806.**

United States Court of Appeals, Fifth Circuit.

Sept. 11, 1987.

---

**34.** 760 F.2d 390, 393 n. 2 (2d Cir.1985).

**35.** H.R.Rep. No. 94–1487, *supra,* at 18, 1976 U.S. Code Cong. & Admin. News at 6617.

Jeff Branick, Provost, Umphrey, Swearingen & Eddins, Port Arthur, Tex., for plaintiffs-appellants.

Michael A. Makulski, in-house counsel, Midland, Mich., Joseph J. Ortego, Stanley Pierce and Josh H. Kardisch of Rivkin, Radler, Dunne & Bayh, Uniondale, N.Y., John G. Bissell, of Strong, Pipkin, Nelson & Bissell, Beaumont, Tex., for defendant-appellee.

Before WRIGHT,* GEE and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In this case today we consider the question whether it is so if an expert says it is so. Although the plaintiff's expert here said it was so, the district court excluded the expert's opinion and granted summary judgment in favor of the defendant, 646 F.Supp. 1420 (E.D.Tex.1986). We uphold the district court because the plaintiff's expert brought to court little more than his credentials and a subjective opinion.

**I**

From April to September 1981, Jules Viterbo used Tordon 10K, a pesticide manufactured by Dow Chemical Company (Dow), to eliminate tallow trees on a 700 acre tract of land in Jefferson County, Texas. On weekends he would pour the Tordon 10K pellets into a bucket and walk through the fields throwing the pellets on the ground. On Christmas Eve 1981, Viterbo experienced his first alleged symptoms of exposure to Tordon 10K. On that day, he cried, was nervous, and had itching on his arms and legs. The symptoms continued until April 1983, at which time he "felt [he] was

more or less out of the woods." At the time of his deposition in July 1984, he stated that he still suffered from a rash and felt "about 80 percent mentally aware [as he] was before [he] got sick." Beginning in 1982, Viterbo saw a number of doctors, including psychiatrists. These doctors diagnosed a variety of ailments, including endogenous depression, depressive neurosis, essential hypertension, and allergies.

In April 1984, Viterbo was admitted to Northeast Community Hospital where he underwent a battery of tests conducted by Dr. Alfred Raymond Johnson to determine the source of his ailment. At that time, he was exposed to a diluted form of Tordon 10K and showed no reaction. Blood tests revealed a high level of certain chemicals, including dieldrin, a herbicide. A fat biopsy was also performed but misplaced by the lab before it could be analyzed. Additionally, tests were performed indicating renal failure and hypertension, for which Viterbo was already taking medication. Finally, an electrocardiogram, CAT scan and immune system studies all produced normal results although allergy tests revealed sensitivity to a variety of molds.

The Viterbos initiated this action to recover damages for the alleged toxic effects on Jules Viterbo of Tordon 10K. After discovery had ended, Dow moved for summary judgment on the ground that the Viterbos were unable to prove the necessary causation and alternatively that the Viterbos' expert testimony was not admissible under Federal Rules of Evidence 703 and 403.[1] The district court agreed with Dow and granted summary judgment.

**II**

In granting Dow's motion for summary judgment, the district court concluded that the expert testimony of Dr. Johnson was inadmissible under Federal Rule of Evidence 703. The district court examined the underlying data on which the experts' opin-

---

* Circuit Judge of the Ninth Circuit, sitting by designation.

1. The district court also excluded the testimony of another expert, Dr. Raymond Singer, offered by the Viterbos. At argument, however, counsel

for Viterbo withdrew him as an expert and conceded the district court properly excluded his testimony. We therefore do not consider the district court's ruling on the admissiblity of his testimony.

ion was based, and found them to be lacking in reliability and probative value. Specifically, the district court held that Dr. Johnson lacked objectivity in that he diagnosed Viterbo's condition as resulting from exposure to Tordon 10K based only on the patient's oral history and without the benefit of medical tests. Additionally, Dr. Johnson had no scientific literature to support his position and the tests which Dr. Johnson performed did not establish a causal link between Viterbo's symptoms and Tordon 10K. The district judge further noted that Dr. Johnson had no experience with Tordon 10K and that none of the four of Viterbo's treating physicians would diagnose Tordon 10K as the cause of Viterbo's condition.

### III

■ Whether summary judgment was appropriate in this case is solely dependent upon whether the district court erred in excluding the testimony of Dr. Johnson. In rulings on the admissibility of expert opinion evidence the trial court has broad discretion and its rulings must be sustained unless manifestly erroneous. *Crawford v. Worth,* 447 F.2d 738, 740–41 (5th Cir.1971); *Rodrigues v. Olin Corporation,* 780 F.2d 491, 494 (5th Cir.1986). There is no dispute here that Dr. Johnson was properly qualified as an expert. The dispute centers on the source and basis of the expert opinion that he tendered. We first look therefore to Federal Rule of Evidence 703, which reads:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Although Rule 703 expanded the acceptable bases of expert opinion at common law, *see Soden v. Freightliner Corp.,* 714 F.2d 498, 502 (5th Cir.1983), this expansion does not extend to "make summary judgment impossible whenever a party has pro-

duced an expert to support its position." *Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 673 (D.C.Cir.1977). The court may still inquire into the reliability and foundation of any expert opinion to determine admissibility. *Soden,* 714 F.2d at 502–03; *In re Agent Orange Product Liability Litigation,* 611 F.Supp.· 1223, 1239 (E.D.N.Y.1985).

■ The district court should, initially, approach its inquiry with the proper deference to the jury's role as the arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration. *See Dixon v. International Harvester Co.,* 754 F.2d 573, 580 (5th Cir.1985). In some cases, however, the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion. Expert opinion testimony falls into this category when that testimony would not actually assist the jury in arriving at an intelligent and sound verdict. *See* J. Weinstein & M. Berger, *Weinstein's Evidence* § 702[1] (1985) (assistance of trier of fact is central concern of Federal Rules of Evidence regarding opinion witnesses). If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury. Furthermore, its lack of reliable support may render it more prejudicial than probative, making it inadmissible under Fed.R.Evid. 403. *See Barrel of Fun, Inc. v. State Farm Fire & Casualty Co.,* 739 F.2d 1028, 1035 (5th Cir.1984) (evidence admissible under Rule 703 must satisfy Rule 403 which excludes evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury").

Against this brief background, we now turn to decide the case before us. As we are reminded by *Soden:* "Though courts have afforded experts a wide latitude in picking and choosing the sources on which to base opinions, Rule 703 nonetheless requires courts to examine the reliability of those sources." *Soden,* 714 F.2d at 505.

"Those sources" here are Viterbo's oral medical history, tests conducted by Dr. Johnson, and a study of the effect of picloram on rats. We examine each source in turn.

### IV

### A.

First Dr. Johnson relies on Viterbo's oral history given during his examination of Viterbo. Although a patient's oral history is generally considered reliable, *see* J. Weinstein and M. Berger, *Weinstein's Evidence* § 703[2] (1985), the history Dr. Johnson used lacked reliability because it was incomplete in a critical area.[2] In forming his opinion, Dr. Johnson was not aware that Viterbo had a family history of depression and hypertension, and that several of his relatives had been hospitalized and treated for these symptoms. This omission is particularly damaging to the reliability of Viterbo's oral history because Viterbo was experiencing symptoms characteristic of depression and hypertension, and Dr. Johnson admitted that hereditary traits could cause symptoms similar to Viterbo's. Thus Dr. Johnson's failure to take into account this family history seriously weakens this source as a foundation for Dr. Johnson's expert opinion.

### B.

Next Dr. Johnson relied on the tests he conducted. The tests, at best, support a conclusion that Viterbo suffers from some sort of toxic reaction. The only supportive test results on which Dr. Johnson relies are those showing hypertension and renal failure, both being characteristic of toxic exposure. Neither these test results nor any test result implicates Tordon 10K as the basis for Viterbo's symptoms.[3] Viterbo was, however, exposed to a small amount of Tordon 10K to which he showed no reaction. Dr. Johnson explained that the hospital board would not allow a patient to be exposed to a large amount of a chemical to which they appeared to be sensitive, even though there was no evidence, except Viterbo's subjective belief, that he was sensitive to Tordon 10K. Dr. Johnson further explained that Viterbo adamantly refused closer contact with Tordon 10K, even though, as noted by defense counsel, Viterbo brought Tordon 10K pellets to Dr. Johnson's office. In attempting to explain Viterbo's failure to react, Dr. Johnson stated that the amount was so small that he did not expect a reaction; the fact remains, however, that Viterbo did not react in the slightest degree. However, blood tests did reveal a high level of another chemical, dieldrin, which can cause depression; Dr. Johnson recognized that the level was high but ignored this chemical as a cause of Viterbo's symptoms, based again on Viterbo's oral history that he had not been in contact with that chemical. According to Dr. Johnson, the dieldrin test was merely an indication of Viterbo's chemical hypersensitivity, but there was no explanation as to how the substance was in Viterbo's blood.

The significance of the lack of objective evidence linking Tordon 10K to Viterbo's ailments is heightened by Dr. Johnson's admission that the symptoms could have a number of causes. When asked to name other potential causes of these symptoms, Dr. Johnson stated, "You know, you read the textbook of medicine, and any page you turn to, you will find those symptoms can be caused by any disease process." It is clear to us, as it was to the district court, that Dr. Johnson's reliance on these test results as a source of his opinion that Tor-

---

**2.** The district court rejected Dr. Johnson's reliance on Viterbo's oral history on the ground that Dr. Johnson formed his opinion before conducting any test. We agree that an expert who forms an opinion before he begins his research is biased and lacking in objectivity. *See Perry v. United States*, 755 F.2d 888 (11th Cir.1985). Because we reject Dr. Johnson's opinion on other grounds, it is not necessary to resolve this question. We would note, however, that this could be an additional ground indicating lack of reliability of his opinion.

**3.** Dr. Johnson himself admitted this at his deposition: "I have not had any scientific proof on a challenge that [Viterbo] is sensitive to Tordon 10–K."

don 10K caused Viterbo's illness is unfounded.

## C.

Finally, Dr. Johnson relied on a study of the effect of picloram on rats that showed that when exposed to large amounts of the chemical, the rats developed cancerous tumors and died. He admitted that the effects of chemicals differ between humans and rats. Here, of course, there was no evidence Viterbo had been exposed to comparable amounts, nor that his symptoms were similar in any respect. We then are left to conclude that the study, at most, is only evidence that picloram may produce some unidentified effect on humans. Such evidence is clearly not sufficient to provide a source of support for an opinion that Tordon 10K caused Viterbo's depression, nervousness, hypertension, renal failure and other ailments.

## V

In summary, then, Dr. Johnson's opinion rests on Viterbo's statements that he experienced certain symptoms and that Tordon 10K was the only possible cause. This opinion simply lacks the foundation and reliability necessary to support expert testimony. As an unsupported opinion, it does not serve the purposes for which it is offered, that is, objectively to assist the jury in arriving at its verdict. We do not hold, of course, that admissibility of an expert opinion depends upon the expert disproving or discrediting every possible cause other than the one espoused by him. Here, however, Dr. Johnson has admitted that Viterbo's symptoms could have numerous causes and, without support save Viterbo's oral history, simply picks the cause that is most advantageous to Viterbo's claim. Indeed, Dr. Johnson's testimony is no more than Viterbo's testimony dressed up and sanctified as the opinion of an expert. Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible. The district court properly excluded and granted summary judgment for Dow.

The judgment of the district court is therefore

AFFIRMED.