Raymond J. LASSIEGNE

v.

TACO BELL CORP., et. al.

No. CIV.A. 00–3259.

United States District Court,
E.D. Louisiana.

April 11, 2002.

Ronald Adams Johnson, Michael W. Mallory, Johnson, Johnson, Barrios & Yacoubian, New Orleans, LA, for Plaintiff.

John Tilghman Culotta, Lorie Guarisco DeMarcay, Hailey, McNamara, Hall, Larmann & Papale, Metairie, LA, Kevin Richard Tully, Christovich & Kearney, LLP,

New Orleans, Lance R. Rydberg, Duncan, Courington & Rydberg, New Orleans, LA, Michael Mossy Christovich, Nicole Songy Loeb, Deutsch, Kerrigan & Stiles, New Orleans, LA, Lawrence J. Duplass, Christian B. Bogart, Duplass, Zwain, Bourgeois & Morton, Metairie, LA, for Defendants.

## ORDER AND REASONS

VANCE, District Judge.

Before the Court are defendants' motions in limine to exclude plaintiff's proffered expert medical testimony. Defendants also move for summary judgment on plaintiff's claims for damages for impotency, migraine headaches and post-traumatic stress disorder. For the following reasons, defendants' motions are granted.

## I. BACKGROUND

On November 30, 1999 plaintiff Raymond Lassiegne, a police officer, purchased a chicken soft taco from a Taco Bell store number 2738 located in Harvey, Louisiana. He was eating in his car, when on his third or fourth bite, he bit down into a hard substance, which apparently was a chicken bone. He swallowed the chicken and the bone, and they became lodged in his throat. Lassiegne asserts that while he choked on the chicken and bone, he felt as though he would pass out. He did not pass out, however, and he admits that the choking incident lasted only a matter of seconds. (Defs.' Mot. in Limine, Ex. A, Dep. Lassiegne, at 201.) Plaintiff drove back to the Taco Bell and reported the incident to the manager. He then went back to work. Later that day, plaintiff went to the emergency room at West Jefferson hospital and was diagnosed with an esophageal abrasion. Plaintiff claims that he was deprived of oxygen during the choking incident and that as a result, he now suffers from migraine headaches, im-

potency and post-traumatic stress disorder. He seeks damages.

Lassiegne relies on the testimony of expert witnesses to prove medical causation. Defendants assert that there is no admissible scientific evidence that plaintiff's choking incident led to migraine headaches, impotency or post-traumatic stress disorder, and asks the Court to exclude the testimony of plaintiff's three medical experts. In addition, defendants ask that the Court grant summary judgment on those claims if the opinion testimony is excluded. Defendants contend that without the expert testimony, plaintiff cannot prove medical causation.

## II. DISCUSSION: MOTIONS IN LIMINE

### A. Legal Standard

The district court has considerable discretion to admit or exclude expert testimony under Federal Rule of Evidence 702. *See General Electric Co. v. Joiner*, 522 U.S. 136, 138–39, 118 S.Ct. 512, 515, 139 L.Ed.2d 508 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir.2000) (citations omitted). Rule 702, which governs the admissibility of expert witness testimony, provides that an expert witness "qualified ... by knowledge, skill, experience, training or education," may testify when scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. FED. R. EVID. 702. *See also Daubert*, 509 U.S. at 587, 113 S.Ct. at 2794. For the testimony to be admissible, Rule 702 establishes the following requirements:

(1) the testimony [must be] based upon sufficient facts or data,

(2) the testimony [must be] the product of reliable principles and methods, and

(3) the witness [must apply] the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

In *Daubert,* the Supreme Court held that Rule 702 requires the district court to act as a "gatekeeper" to ensure that "any and all scientific evidence admitted is not only relevant, but reliable." 509 U.S. at 589, 113 S.Ct. at 2795. *See also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 238 (1999) (clarifying that *Daubert* gatekeeping function applies to all forms of expert testimony). The Court's gatekeeping function thus involves a two-part inquiry into reliability and relevance.

▮ First, the court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. *See Moore v. Ashland Chemical Inc.,* 151 F.3d 269, 276 (5th Cir.1998) (citing *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717 (3rd Cir.1994)). The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. *See Daubert,* 509 U.S. at 589, 113 S.Ct. at 2795. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *See id.* at 590, 113 S.Ct. at 2795.

*Daubert* identified a number of factors that are useful in analyzing reliability of an expert's testimony, including testing, peer review and publication, evaluation of known rates of error, and general acceptance within the scientific community. *See id.* at 592–94, 113 S.Ct. at 2796–97. In *Kumho Tire,* the Supreme Court emphasized that the test of reliability is "flexible" and that *Daubert's* list of specific factors does not necessarily nor exclusively apply to every expert in every case. 526 U.S.

137, 119 S.Ct. at 1175, 143 L.Ed.2d 238. *See also Seatrax,* 200 F.3d at 372 (reliability is fact-specific inquiry and application of *Daubert* factors depends on "nature of the issue at hand, the witness's particular expertise and the subject of the testimony"). Nevertheless, in the vast majority of cases, the district court should first consider the *Daubert* factors before addressing whether other factors are relevant to the case. *See Black v. Food Lion, Inc.,* 171 F.3d 308, 311–12 (5th Cir.1999). *See also Watkins v. Telsmith,* 121 F.3d 984, 991 (5th Cir.1997) (regardless of basis of expert's opinion, *Daubert's* non-exclusive factors are relevant to initial reliability assessment). The overarching goal "is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152, 119 S.Ct. at 1176. The proponent of the expert testimony must prove by a preponderance of the evidence that the testimony is reliable. *Tanner v. Westbrook,* 174 F.3d 542, 547 (5th Cir.1999) (citing *Moore,* 151 F.3d at 276).

The Court must also must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will thereby assist the trier of fact to understand the evidence, in other words, whether it is relevant. *See Daubert,* 509 U.S. at 591, 113 S.Ct. at 2795–96; FED. R. EVID. 702. The Federal Rules of Evidence define "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401.

▮ The Court notes that its role as a gatekeeper does not replace the tradi-

tional adversary system and the place of the jury within the system. *See Daubert,* 509 U.S. at 596, 113 S.Ct. at 2798. As the Supreme Court noted in *Daubert,* "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (citing *Rock v. Arkansas,* 483 U.S. 44, 61, 107 S.Ct. 2704, 2714, 97 L.Ed.2d 37 (1987)). The Fifth Circuit has added that, in determining the admissibility of expert testimony, a district court must defer to "the jury's role as the proper arbiter of disputes between conflicting opinions." As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration. *United States v. 14.38 Acres of Land, More or Less Sit. in Leflore County, Miss.,* 80 F.3d 1074, 1077 (5th Cir.1996) (quoting *Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 422 (5th Cir. 1987)).

### B. Testimony of Dr. Susan McSherry

Plaintiff asserts that after the choking incident, he reported to his doctor a decrease in libido with a simultaneous decrease in morning erections and erections upon attempting intercourse. He also said that his erections had decreased in terms of rigidity. He consulted with Dr. McSherry, a urologist, who had performed a vasectomy and follow-up treatment on Lassiegne in 1994–95. Dr. McSherry is a urologist certified by the American Board of Urology and trained in neural urology.

While defendants do not dispute that Dr. McSherry is properly qualified as an expert, they argue that her testimony should be excluded because it is not reliable. In this case, after taking Lassiegne's self-reported medical history and performing objective tests, Dr. McSherry diagnosed Lassiegne with erectile dysfunction, apparently caused by an ischemic event such as a loss of oxygen. Dr. McSherry identified four possible causes of erectile dysfunction: psychogenic, hormonal, vascular and neurogenic. Dr. McSherry ruled out psychogenic erectile dysfunction because Lassiegne apparently stopped having normal morning erections. (Defs.' Mot. in Limine, Ex. B, Dep. McSherry, at 27.) She determined that his erectile dysfunction did not have a hormonal cause because his PSA, testosterone and chemistry panel levels were normal. (*Id.,* at 28.) Further, based on the results of a Penile Doppler Blood Flow Study, she determined that Lassiegne's erectile dysfunction was not vasculogenic. (*Id.,* at 31.)

After running these tests and ruling out the other causes of erectile dysfunction, Dr. McSherry concluded that Lassiegne's erectile dysfunction was neurogenic, in that it was caused by "any kind of disruption of the nerve control of the erections, whether it be in the brain, the spinal cord or peripheral nerves." (*Id.* at 35.) Dr. McSherry hypothesized that Lassiegne suffered a "neurological event" as a result of the choking incident, which left a "neural lesion" in his brain. (*Id.,* at 24.) She conceded that such a lesion had to be "microscopic" because Lassiegne's "x-rays didn't show any specific damage." (*Id.*) Dr. McSherry admits that she ran no tests to determine if Lassiegne had suffered any brain damage. (*Id.* at 35–46.)

Dr. McSherry testified that there is "no test" to directly test for neurologic lesions associated with erectile dysfunction. She stated that she was not aware of "any tests you can run to locate the actual site [of the nerve damage]" and that such a diagnosis is "based a lot on the patient's history." (*Id.* at 36.) Further, Dr. McSherry testified that the "process of elimination" meth-

odology to determine whether the cause of erectile dysfunction is neurogenic is a theory that has been generally accepted by the urological scientific community. (*Id.,* at 98–99.) She testified that the theory has been subjected to peer review and publication. (*Id.* at 98.) Specifically, she pointed out that the methodology was discussed in *Campbell's Textbook of Urology.* (*Id.* at 98–99.)

■ The Court finds that although Dr. McSherry may have followed an accepted methodology in diagnosing Lassiegne with erectile dysfunction, her ultimate conclusion that the choking incident caused erectile dysfunction is unreliable. Dr. McSherry presents no scientific basis, no "specific train of medical evidence," to link Mr. Lassiegne's choking incident to his erectile dysfunction. *Black v. Food Lion, Inc.,* 171 F.3d 308, 314 (5th Cir.1999). In *Food Lion,* the Fifth Circuit emphasized that *Daubert* and its progeny require that an expert's opinion be applied "fact-specifically" in each case. *Id.* Indeed, the Fifth Circuit stated that the "use of a general methodology cannot vindicate a conclusion for which there is no underlying medical support." *Id.*

Here, Dr. McSherry presented no scientific basis for her ultimate conclusion that the choking incident caused a brain injury that caused plaintiff's erectile dysfunction. By her own testimony, Dr. McSherry admitted that her conclusion was speculative.

> I'm *assuming* in his case, since it was an abrupt onset [of erectile dysfunction] and he gives a history of completely normal erections and then an accident of some sort, which the way he describes it to me was *possibly* an anoxic or ischemic event, that something happened in his brain that could cause this.

(*Id.,* at 23) (emphasis added.) Further, it is clear from her testimony that Dr. McSherry determined that the choking in-

cident was responsible for the brain damage based on temporal proximity alone.

> Q. And your theory that it's the choking incident that caused this erectile dysfunction is based on the chronology of events as given to you by Mr. Lassiegne; is that correct?
>
> A. Yes.

(*Id.,* at 119.) In *Moore v. Ashland Chemical Inc.,* the Fifth Circuit upheld the district court's exclusion of expert testimony when the expert relied "substantially on the temporal proximity between exposure and symptoms." 151 F.3d 269, 278 (5th Cir.1998) (en banc).

In fact, Dr. McSherry arrived at her opinion without any information regarding how much time plaintiff was deprived of oxygen or whether plaintiff was deprived of oxygen at all.

> Q. But you have no knowledge about how long he was deprived of oxygen?
>
> A. No.
>
> Q. You don't even know if he was deprived of oxygen?
>
> A. No.

(*Id.,* at 120.) Dr. McSherry offers no scientific support for a general theory that loss of oxygen for *any amount of time* would cause a neurological event sufficient to result in erectile dysfunction. *See Curtis v. M & S Petroleum, Inc.,* 174 F.3d 661, 671 (5th Cir.1999) ("[I]f [the doctor's] causation opinion was not based on sufficient information of the level of benzene to which Plaintiffs were exposed, his methodology would not be reliable, rendering his causation opinion inadmissible."); *Moore,* 151 F.3d at 278 ("Because he had no accurate information on the level of Moore's exposure to the fumes, Dr. Jenkins necessarily had no support for the theory that the level of chemicals to which Moore was exposed causes RADS.").

Finally, the Court finds that Dr. McSherry lacked the kind of specialized knowledge required to testify about causation. *See Tanner v. Westbrook*, 174 F.3d 542, 548 (5th Cir.1999). What is in dispute in this case is whether plaintiff's choking incident caused his erectile dysfunction, not whether an anoxic event can cause erectile dysfunction generally. As the Supreme Court observed in *Kumho*, "the question before the trial court was specific, not general. The trial court had to decide whether this particular expert had sufficient specified knowledge to assist the jurors in deciding the particular issues in this case." *Kumho Tire*, 526 U.S. 137, 119 S.Ct. at 1178, 143 L.Ed.2d 238 (internal quotation marks and citations omitted).

In this case, Dr. McSherry admitted that she was not qualified to opine on the existence of a neural lesion or on the amount of oxygen deprivation that is necessary to cause anoxic brain damage. She testified that she was only qualified to state that Lassiegne fell "into the neurological etiology of erectile dysfunction." (*Id.* at 25.) Indeed, when pressed to discuss the specifics of the type of brain trauma needed to cause erectile dysfunction, she deferred to a neurologist. (*Id.,* at 22.)

Based on the deposition testimony, the Court finds that Dr. McSherry's opinion that the choking incident caused plaintiff's erectile dysfunction has no scientific basis and is not sufficiently reliable under Rule 702 of the Federal Rules. The Court therefore excludes this causation ·opinion.

## C.  Testimony of Dr. Steven Atkins

■ The Court finds that the testimony of Dr. Steven Atkins that the choking incident caused plaintiff's migraines suffers from the same deficiencies as Dr. McSherry's testimony. It is not disputed that Dr. Atkins, a board certified neurologist, is qualified to testify as a witness. Dr. At-kins testified that he arrived at the conclusion that plaintiff suffered from migraine headaches based on plaintiff's history and his own knowledge of other cases in clinical medicine. (Defs.' Mot. in Limine, Ex. D, Dep. Atkins, at 65–66.) He testified that there is no diagnostic "test" for headaches. (*Id.*) Dr. Atkins did observe that plaintiff's EEG, a test of brain physiologic activity, as well as his CT scan and his SPECT scan were normal. (*Id.,* at 54–55.)

To be helpful on the issue of medical causation, Dr. Atkins must do more than diagnose plaintiff with migraine headaches or establish that deprivation of oxygen to the brain can cause migraine headaches. Rather, he must provide a reliable causative link between this choking incident and plaintiff's migraines. Dr. Atkins gives the following explanation for his conclusion that the choking incident was in fact the cause of plaintiff's migraines:

Q.  Can you please explain to me how a choking incident could cause Mr. Lassiegne to suffer from migraine headaches?

A.  Because during a choking incident, people [are] not breathing efficiently, correct, and by definition, if you're choking, you're not breathing properly. That means there's decreased oxygen to the brain. Decreased oxygen to the brain can cause injury to the brain. Injury to the brain such as that can cause headaches, and can also cause chronic headaches.

(Defs.' Mot. in Limine, Ex. D., Dep. Atkins, at 58.) Dr. Atkins explained that in the context of a cardiac arrest, "within several minutes to six minutes is about when the brain will begin suffering irreversible ischemic or anoxic damage." (*Id.* at 58–59.) Dr. Atkins admits, however, that he arrived at his conclusion that plaintiff's choking incident caused migraine

headaches without considering how long plaintiff was deprived of oxygen.

Q. Did Mr. Lassiegne tell you how long he allegedly choked?

A. He did not specify the time to me. (*Id.*, at 62.)

Q. Do you have any information as to how long that near choking incident lasted?

A. No, I do not. (*Id.*, at 95.)

Dr. Atkins offers no scientific support for a general theory that loss of oxygen for *any amount of time* would cause brain damage sufficient to result in migraine headaches. *See Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 671 (5th Cir.1999); *Moore*, 151 F.3d at 278. Indeed, Dr. Atkins admits that he is aware of no scientific literature supporting a theory that a minimal amount of oxygen loss causes brain damage. (*Id.*, at 101–102.) As with Dr. McSherry's testimony, the Court finds that Dr. Atkins furnishes no "specific train of medical evidence" tying Mr. Lassiegne's choking incident to his migraine headaches. *Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir.1999).

Since Dr. Atkins' testimony as to causation is not based on a factual basis sufficient to support a conclusion regarding causation, the Court excludes it as unreliable.

### D. Testimony of Randell L. Hess

Randell L. Hess is a licensed clinical social worker, with training in biofeedback, and an expertise in stress, anxiety, depression and post-traumatic stress disorders (Defs.' Mot. in Limine, Ex. G, Dep. Hess, at 12, 73–75, 77–79.) It is undisputed that Hess is qualified to testify as an expert as to post-traumatic stress disorder ("PTSD"). Hess met with Lassiegne on May 3, 2000, May 27, 2000, July 20, 2000 and March 14, 2001.

In his deposition testimony, Hess stated that he diagnosed PTSD based on the criteria established by the Diagnostic and Statistical Manual, Fourth Edition ("DSM–IV"), the "authoritative text in treating mental disorders." (*Id.* at 17, 83–84, 102–106). He stated the following about this methodology:

Basically from the clinical interview, looking at the criteria, at the DSM–IV, what it states, [PTSD] was the diagnosis I arrived at.

(*Id.*, at 35.) Hess identified the following facts as asserted by Lassiegne as the basis for his diagnosis:

That [Lassiegne] had experienced an actual or threatened event of death which was the choking. A sense of helplessness. That he had recurring and intrusive distressing recollections of the event, recurring stressing dreams of the event. That he had efforts to avoid those thoughts or feelings. That he avoided places that brought back those feelings. And he had some sense of, I guess you'd call it, doom and gloom, about the uncertainties of the future. He had difficulty falling asleep. He was irritable and had behavior outbursts, difficulty concentrating, and that those had lasted more than a month.

(*Id.*, at 35–36.) Hess testified that any kind of near-death experience can cause PTSD, including a "chicken bone or a pretzel or something else." (*Id.* at 38.) Hess also testified that he considered a differential diagnosis for plaintiff, including "strictly depression, acute stress disorder, generalized anxiety disorder," but ruled those diagnoses out based on the criteria listed in the DSM–IV. (*Id.*, at 41.)

Defendants argue that Hess's diagnosis was unreliable because plaintiff failed to inform Hess of certain essential facts, such as that his brother suffered from depression, delusions and cocaine dependence,

that he was engaged in litigation, and that his mother committed suicide with his gun in July of 2000 and that he discovered her body. Defendants assert that since plaintiff withheld key facts and provided inconsistent answers, Hess' testimony was not based upon sufficient facts or data and accordingly, not admissible under Rule 702. The Court agrees.

In *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 423 (5th Cir.1987), the Fifth Circuit upheld the district court's decision to exclude expert testimony that plaintiff had been injured by his exposure to a chemical because the doctor's opinion was based on a "weak foundation." In that case, the doctor relied on plaintiff's self-reported history, which was "incomplete in a critical area." *Id.* at 423. The doctor had not been informed that plaintiff had a family history of depression and hypertension. The doctor admitted that plaintiff's symptoms were characteristic of depression and hypertension. *Id.* at 423. The Fifth Circuit found that the doctor's "failure to take into account this family history seriously weakens this source as a foundation for Dr. Johnson's expert opinion" and held that the district court had correctly excluded the evidence. *Id.*, at 423. In this case, it is undisputed that Lassiegne failed to disclose to Hess certain relevant facts and, in fact, provided different accounts of his symptoms to different doctors. Under these circumstances, the Court finds that Lassiegne's porous account of his history is too flimsy a foundation to support Hess' conclusion.

In his deposition, Hess acknowledged that when he diagnosed psychological disorders, he relied on the accuracy and completeness of his patient's self-reported history.

Q. In diagnosing your patients and treating them, you really have to rely on your patient as a historian, correct?

A. In most cases.

(*Id.*, at 45). Hess also stated that he ruled out possible alternative diagnoses, like depression, based on the factual information given to him by plaintiff.

Q. Is it fair to say that you ruled out the possibility of depression as being Mr. Lassiegne's main problem based on what he's telling you, his reporting of his symptoms to you?

A. Correct.

(*Id.*, at 45–46.) Based on Hess' testimony, it is clear that the reliability of a diagnosis using the DSM–IV depends on the reliability of the underlying factual basis for the diagnosis.

In this case, it is undisputed that Lassiegne's clinical interviews with Hess were rife with omissions and inconsistencies with regard to information relevant to a diagnosis of PTSD. Most importantly, Lassiegne never told Hess that his brother, who drowned in 1998, had experienced depression, delusions and had a cocaine dependency problems. (*Id.*, at 58; Ex. A, Dep. Lassiegne, at 235.) Hess stated that this information indicated that Lassiegne may have had a family history of depression and such a family history would have had an impact on his diagnosis.

Q. Would any of those factors regarding his brother having experienced depression, delusions or cocaine addiction indicate that there was a family history or possible family history of depression?

A. It would have.

Q. Would a patient's family history with respect to mental disorders or illness have any effect on your opinion as to either *the cause of the problem* or the nature of their problem?

A. *Hypothetically, yes.* In this case, the things that have been indicating

that I was not aware of, still impacts, I think, his ability to deal with things, but *it doesn't necessarily cause the PTSD*. People have a lot of experiences that they go through and deal with or don't deal with, but having—again, based on the symptoms that he indicated and so forth, they—what he was—the PTSD was resulting from the choking incident.

(*Id.,* at 58–59) (emphasis added.) Although Hess stated that the information Lassiegne withheld did not "necessarily cause" PTSD, it is clear that the undisclosed information could have impacted Hess' diagnosis, particularly since he had to rule out depression as the source of plaintiff's problems in making a differential diagnosis. (*Id.*)

Further, Hess acknowledged that malingering needed to be "ruled out" when the patient has a financial interest in a diagnosis, but that he did not "actively" consider whether Lassiegne was malingering.

Q. Would you agree that malingering should be ruled out in a situation in which financial remuneration, benefit, eligibility and forensic determinations play a role?

A. Sure.

.        .        .        .        .

Q. Did you consider whether Mr. Lassiegne was malingering?

A. Not actively, no.

(*Id.,* at 42.) Hess stated that Lassiegne never told him that he was involved in litigation, even though Hess generally asked during the clinical interview whether there were any legal issues that he needed to consider. Hess stated that he did not have this information when he made the "initial diagnosis" of PTSD.

1. The Court notes that Lassiegne also reported at his October 30, 2001 deposition that both his parents were in good health, when

A. . . . [W]hen I made the initial diagnosis, there was no discussion of a lawsuit. It was strictly on a clinical basis.

Q. When, if ever, did Mr. Lassiegne mention that he was involved in a lawsuit?

A. I don't believe he ever did. I think I just go something in the mail from the attorneys.

Q. Do you ask your patients normally if they're involved in any litigation or anything like that?

A. I usually ask if there are any legal concerns that they have.

(*Id.,* at 43.) When asked about whether this information would have changed his diagnosis, Hess stated that he "informally ruled [malingering] out." (*Id.,* at 44.) Hess failed to explain, however, how he "informally" rules out malingering. Further, he conceded that a neuropsychological evaluation to rule out the possibility of malingering would have been helpful "from a treatment standpoint." (*Id.,* at 44.)

In addition, Lassiegne never told Hess that his mother committed suicide, with his gun, and that he discovered the body in July 2000.[1] (*Id.,* at 46, 62.) Hess testified that it was important in dealing with psychological disorders for patients to tell him about any traumatic events in their lives.

Q. And, in particular, in dealing with psychological disorders, it's important, would you agree, for your patients to tell you about any traumatic events that occur in their life while you're treating them.

A. Correct.

Q. Because it's possible that these events could have quite an effect on their well-being; correct?

his mother had in fact committed suicide in July 2000. (Defs.' Mot. in Limine, Ex. A, Dep. Lassiegne, at 10.)

A. Possible, yes.

(*Id.*, Ex. G, Dep. Hess, at 45–46.) Here, it is undisputed that Lassiegne had an appointment with Hess two weeks after his mother's suicide, on July 20, 2000. (*Id.*, at 62.) Hess stated the suicide was a "significant event" and that it "would have" been helpful in diagnosing Lassiegne. (*Id.*, at 46.) Hess also found it "significant" that Lassiegne did not inform Hess of the suicide. (*Id.*, at 62.)

Hess also confirmed that Lassiegne provided descriptions of his symptoms to other doctors that were inconsistent with the symptoms Lassiegne self-reported to him. (*Id.*, at 65.) Hess confirmed that one of the factors in diagnosing PTSD is that the traumatic experience is persistently reexperienced in one of the following ways: recurrent and intrusive distressing recollections of the event, recurrent distressing dreams of the events, intense distress at the exposure to internal and external cues or flashbacks (*Id.*, at 103–04, 109). Consistent with those criteria, Lassiegne told Hess that he had flashbacks and nightmares. (*Id.*, at 104–105.) Lassiegne, however, told Dr. Desselle that he did not have flashbacks. (*Id.*, at 113–114.) Hess acknowledged that such contradictory reports could impact his diagnosis of PTSD.

Q. When we were talking earlier about the diagnosis of post-traumatic stress disorder . . . that one of the critical factors in making that diagnosis as opposed to some other disorder was the recurrent thought or flashbacks; is that a correct understanding.

A. Yes, that's a significant part.

.      .      .      .      .

Q. If you learned that he was not, in fact, experiencing flashbacks?

A. At what point in time?

Q. Ever.

A. If he's say, not experiencing it now?

Q. Well, say, if he had never experienced them?

A. If he had never experienced them, yes, that would be significant.

(*Id.*, at 109–110.) Further, Lassiegne denied having PTSD to Dr. McSherry. (*Id.*, 91–92, 114; Ex. 4.) Hess stated that he would have like to have known "why Lassiegne would say that." (*Id.*, at 92.)

Moreover, there are indications that Hess uncritically accepted plaintiff's account and failed to interpose much in the way of independent professional judgment in arriving at his conclusion. Hess concluded that plaintiff suffered from PTSD as a result of choking on a chicken taco, even though plaintiff admits that he still eats at the same Taco Bell and eats chicken from fast food restaurants. (Defs.' Mot. in Limine, Ex. A, Dep. Lassiegne, at 155–56, 177.) In addition, plaintiff is a police officer who carries a gun and who apparently risks his life on a daily basis. (*Id.*, at 109, 172–73.) He has weathered the deaths of his brother and mother in a two and a half year period. Yet, when plaintiff asserted that he has been traumatized for over a year from choking on a chicken bone that did not even cause him to pass out, Hess had no qualms about diagnosing him with PTSD. (*Id.*, at 194.) Further, Hess clings to this conclusion in the face of mounting evidence of significant omissions from Lassiegne's self-reported history, and he fails to give an adequate explanation of why his opinion is still valid.

Based on the cumulative effect of the foregoing inconsistencies and omissions in Lassiegne's self-reported oral history—the accuracy and completeness of which Hess relied upon in making his diagnosis—the Court finds that Lassiegne did not provide Hess with a sufficient factual basis for Hess to arrive at a reliable diagnosis. Ac-

cordingly, the Court excludes Hess' opinion testimony as to medical causation.

### E. Testimony as to the Possibility of Causation

■ The Court rejects the plaintiff's suggestion that Dr. McSherry, Dr. Atkins and Mr. Hess be allowed to testify as to the "possibility of causation." Expert testimony is not admissible when it is based merely on subjective belief or unsupported speculation. *See Daubert,* 509 U.S. at 590, 113 S.Ct. at 2795. Plaintiff has not submitted any post-*Daubert* case law that contradicts that position.

### III. DISCUSSION: SUMMARY JUDGMENT

#### A. Legal Standard

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2551, 91 L.Ed.2d 265 (1986). The court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party bears the burden of establishing that there are no genuine issues of material fact. *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1445 (5th Cir. 1993). A factual dispute precludes a grant of summary judgment if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *See Hunt v. Rapides Healthcare System, LLC,* 277 F.3d 757 (5th Cir.2001) (citations omitted).

If the dispositive issue is one for which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2552; *Lavespere,* 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exits. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

#### B. Analysis

Defendants have moved for summary judgment on plaintiff's claims for damages for impotency, migraine headaches and PTSD, arguing that under Louisiana law, plaintiff cannot meet his burden of proof on causation without medical expert testimony. Plaintiff argues that his own testimony is sufficient to establish a causal link between the choking incident and impotency, migraine headaches and post-traumatic stress disorder and asserts that under *Housley v. Cerise,* 579 So.2d 973 (La.1991), he is entitled to the presumption of causation. The Court disagrees.

■ In *Housley,* the Louisiana Supreme Court held that a presumption of causation in favor of the plaintiff applied in cases where plaintiff showed that (1) he was in good health before the accident, and (2) the medical testimony showed a reasonable possibility that the accident caused the injury. 579 So.2d at 980 ("[a] claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility

of causal connection between the accident and the disabling condition.") The Court finds that the *Housley* presumption does not apply in this case because the medical evidence does not show a reasonable possibility that the choking incident caused the injury. The Court has already excluded the expert medical testimony as to causation as unreliable. In addition, Dr. Atkins admitted that he knew of no other case in which an individual sustained brain damage following a choking incident in which there was only a partial obstruction of the airway. (Defs.' Mot. in Limine, Ex. D, Dep. Atkins, at 126–27.) Dr. McSherry testified that in her fifteen years of practice, she had never had a patient who developed erectile dysfunction from a choking incident. (*Id.*, Ex. B, Dep. McSherry, at 101–02.) Mr. Hess stated that he was not familiar with any literature or case studies in which choking on something caused PTSD. (*Id.*, Ex. G, Dep. Hess, 37–38.) All of the objective medical tests showed that Lassiegne had no brain damage. (*Id.* Ex. D, Dep. Atkins, at 54–55.) In stark contrast, in *Housley,* all of the experts agreed that a fall can cause the premature rupture of a pregnant woman's water bag. 579 So.2d at 979. The Court finds that since plaintiff has not met his burden of showing that the medical evidence established a "reasonable possibility" of a causal connection, the *Housley* presumption does not apply.

■ Plaintiff also argues that the Court should allow his experts to testify as fact witnesses, and that plaintiff's testimony plus the experts' fact testimony is sufficient to prove medical causation.[2] The Court rejects this argument. The Louisiana Supreme Court has held that when the conclusion regarding medical causation is not one within common knowledge, expert medical testimony is required to prove causation. *See Pfiffner v. Correa,* 643 So.2d 1228, 1234–35 (La.1994). It is not disputed that the causes of impotency, migraine headaches and PTSD are not matters within the common knowledge of a layperson. Accordingly, plaintiff must present admissible expert testimony regarding causation to meet his burden, and he cannot do that in this case.

The Court therefore grants defendants' motion for summary judgment on plaintiff's claims for damages for impotency, migraine headaches and PTSD. *See Black v. Food Lion,* 171 F.3d 308, 314 (5th Cir. 1999) ("Without Dr. Reyna's testimony, Black cannot hold Food Lion liable for medical expenses, lost wages, or pain and suffering attributable to her fibromyalgia.") The Court, however, rejects defendant Keystone's argument that this case should be dismissed in its entirety. Lassiegne may still be compensated for any damages and medical expense incurred for the treatment of his esophageal abrasion caused by the alleged choking incident. *See id.* The Court also excludes any testimony regarding impotency, migraine headaches or PTSD at trial as irrelevant, since plaintiff cannot prove that there is a causal connection between the choking incident and those ailments.

## IV. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to limine to exclude the causation testimony of Drs. McSherry and Atkins, and Mr. Hess. In addition, the Court finds that without expert testimony, plaintiff can not meet his burden of proof in showing causation. The

---

**2.** In support, plaintiff cites *Arceneaux v. Howard,* 633 So.2d 207, (La.App. 1st Cir.1993), which the Court finds to be inapplicable. In *Arceneaux,* the state appellate court found that the *Housley* presumption applied, and in this case, the Court has found that the *Housley* presumption does not apply.

Court therefore grants defendants' motion for summary judgment and dismisses plaintiff's claims for damages for impotency, migraine headaches and PTSD.