Opinion issued February 6, 2003















In The
Court of Appeals
For The
First District of Texas




NO. 01-01-00319-CV




EUGINA J. DANIELS AND ISADORA SUSAN DANIELS, Appellants

V.

LYONDELL-CITGO REFINING CO., LTD.,
 ATLANTIC RICHFIELD COMPANY,
 AND LYONDELL CHEMICAL COMPANY F/K/A
LYONDELL PETROCHEMICAL COMPANY, Appellees




On Appeal from the 133rd District Court
Harris County, Texas
Trial Court Cause No. 1999-31936




O P I N I O N
          After James B. Daniels died of lung cancer allegedly caused by workplace
exposure to benzene, Daniels’s wife and daughter sued Lyondell-Citgo Refining Co.,
Ltd., Atlantic Richfield Company, and Lyondell Chemical Company f/k/a Lyondell
Petrochemical Company,


 the owners of the refinery where Daniels had worked. The
trial court granted a no-evidence summary judgment in favor of the refinery owners
on the issue of causation.
          In two points of error, Eugina J. Daniels and Isadora Susan Daniels (the
Daniels family) argue that they presented more than a scintilla of evidence on general
and specific causation and that the trial court erred when it granted summary
judgment. We affirm.
Background



          James B. Daniels began working for a petrochemical plant in 1976. The plant
is currently owned by Lyondell-Citgo Refining Co., Ltd, but was previously owned
and operated by Atlantic Richfield Company and Lyondell Petrochemical Company. 
Throughout his career, Daniels worked in the Aromatics Recovery Unit (ARU),
holding various positions as assistant stillman, helper, boardman, and operator.
          During the course of his work, Daniels was exposed to a variety of chemicals,
including benzene, mixed xylenes, ethylene, and propane. There were allegedly
numerous benzene leaks, which usually occurred in conjunction with the plant’s low-line connection and feed filtrate coils. The “low-line” is a system of pipes wherein
various chemicals—including benzene—are moved throughout the plant. The feed
filtrate coils take chemicals used for mixing chemical product from the “hot side” of
the ARU the cooler side wherein they are actually mixed.
          In October 1996, Daniels was diagnosed with bronchial alveolar carcinoma, a
form of terminal lung cancer. He died in October 1997 at the age of 56.
          The Daniels family sued the refineries for negligence and gross negligence in
this wrongful death action. The petition alleged that the refineries were responsible
for Daniels’s death “through their willful act and omission or gross negligence in
allowing the improper release of known carcinogens into Jim Daniels’ (sic) work
environment. By their wrongful conduct, Jim Daniels was exposed to carcinogens
which resulted in his death.”
          The refinery owners filed a no-evidence motion for summary judgment based
solely on the Daniels family’s inability to show any evidence that benzene causes
bronchial alveolar carcinoma in humans. A hearing was held on the motion, and the
trial court granted the Daniels family additional time to conduct discovery. A second
hearing was held, and the trial court granted the refinery owners’ motion for summary
judgment.
Standard of Review 
          Under rule 166a(i), a party is entitled to summary judgment if, after adequate
time for discovery, there is no evidence of one or more essential elements of a claim
or defense on which an adverse party would have the burden of proof at trial. Tex. R.
Civ. P. 166a(i). Thus, a no-evidence summary judgment is similar to a directed
verdict. Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp., 994
S.W.2d 830, 834 (Tex. App.—Houston [1st Dist.] 1999, no pet.). The motion for
summary judgment may not be general, but must state the elements on which there
is no evidence. Tex. R. Civ. P. 166a(i).
          The trial court must grant the motion unless the non-movant produces more
than a scintilla of evidence raising a genuine issue of material fact on each of the
challenged elements. Tex. R. Civ. P. 166a(i); Macias v. Fiesta Mart, Inc., 988
S.W.2d 316, 317 (Tex. App.—Houston [1st Dist.] 1999, no pet.). More than a
scintilla of evidence exists when the evidence supporting the finding, as a whole,
rises to a level that would enable reasonable and fair-minded people to differ in their
conclusions. Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex. 1995).
Causation
          The central issue presented is not whether the Daniels family’s witnesses
possessed adequate credentials, skills, or experience to testify about causation. The
issue before us is whether the trial court abused its discretion in finding that the
Daniels family’s evidence was scientifically unreliable and thus legally insufficient
to defeat the refinery owners’ motion for summary judgment.
          Sometimes, causation in toxic tort cases is discussed in terms of general and
specific causation. Merrell Dow Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706,
714 (Tex. 1997). General causation exists when a substance is capable of causing a
particular injury or condition in the general population, while specific causation exists
when a substance causes a particular individual’s injury. Id. In many toxic tort cases,
direct experimentation cannot be done, and there will be no reliable evidence of
specific causation. Id. at 715.
          The Daniels family presented evidence from two experts—Michael Wolfson,
M.D., a board certified specialist in occupational medicine, and Hari Dayal, Ph.D.,
a professor and researcher in human epidemiology at the University of Texas Medical
Branch, Galveston—to support their general causation theory that occupational
exposure to benzene at an oil refinery causes lung cancer. An expert’s bare opinion
will not suffice. See Burroughs Wellcome, 907 S.W.2d at 499-500. When the expert
brings to court little more than his credentials and a subjective opinion, this is not
evidence that would support a judgment. Viterbo v. Dow Chem. Co., 826 F.2d 420,
421 (5th Cir. 1987). The testimony of an expert is generally opinion testimony. 
Whether it rises to the level of evidence is determined under our rules of evidence,
including rule 702, which require courts to determine if the opinion testimony will
assist the jury in deciding a fact issue.


 Havner, 953 S.W.2d at 712.
          In Havner, the Texas Supreme Court clarified this determination as follows:
To say that the expert’s testimony is some evidence under our standard
of review simply because the expert testified that the underlying
technique or methodology supporting his or her opinion is generally
accepted by the scientific community is putting the cart before the horse. 
 
Id. The underlying data should be independently evaluated in determining whether
the opinion itself is reliable.
          In E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549 (Tex. 1995),
the Texas Supreme Court set forth some of the factors that courts should consider in
looking beyond the bare opinion of the expert. Those factors include:
          (1)     the extent to which the theory has been or can be tested;
(2)the extent to which the technique relies upon the subjective
interpretation of the expert;
 
          (3)     whether the theory has been subjected to peer review and
publication;
 
          (4)     the technique’s potential rate of error;
 
          (5)     whether the underlying theory or technique has been generally accepted
as valid by the relevant scientific community; and
 
          (6)     the non-judicial uses that have been made of the theory or technique.

See Robinson, 923 S.W.2d at 557.


 If the foundational data underlying opinion
testimony are unreliable, an expert will not be permitted to base an opinion on that
data because any opinion drawn from that data is likewise unreliable. Havner, 953
S.W.2d at 714.
          In point of error one, the Daniels family argues that it presented more than a
scintilla of evidence on general causation. It relies, to a considerable extent, on
epidemiological studies for proof of general causation. Accordingly, we consider the
use of epidemiological studies and the “more likely than not” burden of proof.
          Epidemiological studies examine existing populations to attempt to determine
if there is an association between a disease or condition and a factor suspected of
causing that disease or condition. Id. at 715 (citing Bert Black & David E. Lilienfeld,
Epidemiologic Proof in Toxic Tort Litigation, 52 Fordham L. Rev. 732, 750 (1984)). 
Commentators in this area uniformly acknowledge that epidemiological studies
cannot establish that a given individual contracted a disease or condition due to
exposure to a particular drug or agent. See, e.g., Michael Dore, A Commentary on the
Use of Epidemiological Evidence in Demonstrating Cause-In-Fact, 7 Harv. Envtl. 
L. Rev. 429, 431-35 (1983); Steve Gold, Causation in Toxic Torts: Burdens of
Proof, Standards of Persuasion, and Statistical Evidence, 96 Yale L. J. 376, 380
(1986).
Relative Risk



          Recognizing that epidemiological studies cannot establish the actual cause of
an individual’s injury or condition, a difficult question for the courts is how a plaintiff
faced with this conundrum can raise a fact issue on causation and meet the “more
likely than not” burden of proof.
          Generally, epidemiological studies showing an increased risk may support a
recovery. The Havner court, recognizing that there is not a precise fit between
science and legal burdens of proof, was persuaded that properly designed and
executed epidemiological studies may be part of the evidence supporting causation
in a toxic tort case and that there is a rational basis for relating the requirement that
there be more than a “doubling of the risk” to the no-evidence standard of review and
to the “more likely than not” burden of proof. Havner, 953 S.W.2d at 717.


 “The use
of scientifically reliable epidemiological studies and the requirement of more than a
doubling of the risk strikes a balance between the needs of our legal system and the
limits of science.” Id. at 718.
          The Supreme Court was careful to note, however, that a relative risk of more
than 2.0 is not a litmus test and no single epidemiological test is legally sufficient
evidence of causation. Id. Other factors, such as the Robinson factors, supra, must
be considered because there may in fact be no causal relationship even if the relative
risk is high.
Scientific Reliability
          Sound methodology also requires that the design and execution of
epidemiological studies be examined. For example, bias can dramatically affect the
scientific reliability of an epidemiological study. Id. at 719. Epidemiological studies
“are subject to many biases and therefore present formidable problems in design and
execution and even greater problems in interpretation.” Id. (quoting Marcia Angell,
The Interpretation of Epidemiologic Studies, 323 New Eng. J. Med. 823, 824
(1996)). Expert testimony that is not scientifically reliable cannot be used to shore
up epidemiological studies that fail to indicate more than a doubling of the risk. Id.
Similarity
          To raise a fact issue on causation and thus to survive legal sufficiency review,
a claimant must do more than simply introduce into evidence epidemiological studies
that show a substantially elevated risk. A claimant must show that he or she is similar
to those in the studies. This would include proof that (1) the injured person was
exposed to the same substance, (2) the exposure or dose levels were comparable to
or greater than those in the studies, (3) the exposure occurred before the onset of
injury, (4) the timing of the onset of injury was consistent with that experienced by
those in the study, and (5) if there are other plausible causes of the injury or condition
that could be negated, the plaintiff must offer evidence excluding those causes with
reasonable certainty. Havner, 953 S.W.2d at 720.
          In sum, courts must make a determination of reliability from all the evidence. 
Id. Courts should allow a party, plaintiff or defendant, to present the best available
evidence, assuming it passes muster under the five factors listed in the previous
paragraph, and only then should a court determine from a totality of the evidence,
considering all factors affecting the reliability of particular studies, whether there is
legally sufficient evidence to support a judgment. Id. Finally, courts should not
foreclose the possibility that advances in science may require re-evaluation of what
is “good science” in future cases. Id. at 721.
          The Daniels family’s summary judgment evidence is grounded in three studies: 
(1) a 1989 study of Chinese factory workers, (2) a 1989 study of Italian refinery
workers, and (3) a 1979 study of British workers.    We will review each of these
studies according to the factors delineated in Havner.
          1.       Chinese Factory Workers - 1989



          This retrospective cohort study evaluated 28,460 benzene-exposed workers
from 233 factories in China.


 The primary types of factories or manufacturing
processes involving benzene exposure were spray or brush painting, shoe
manufacturing, synthetic rubber production, leather processing, organic chemical, and
adhesive production facilities. Increased mortality was noted among benzene-exposed males in comparison with that among unexposed males. The standardized
mortality ratio (SMR) was 2.31—thus satisfying the Havner requirement that the
relative risk be more than 2.0. See Havner, 953 S.W.2d at 718. Importantly,
however, the 2.31 SMR was for benzene-exposed non-smokers. The SMR for
benzene-exposed smokers was 1.20. At the conclusion of the study, the authors
stated that “the present study has suggested that other cancers, as well as some
nonmalignant conditions, may be associated with benzene exposure.” (Emphasis
added.)
          This study was part of an ongoing analysis. There were at least three additional
articles, all of which were attached as exhibits to the refinery owners’ motion for
summary judgment.


 The results reported in the 1996 article indicated that, when the
sample size was enlarged from 28,460 in the original study to 74,828 in the follow-up
study, the mortality ratio for lung cancer for men exposed to benzene was 1.5,
compared to 2.31 in the original study. Because the SMR was no longer doubled, we
hold that the findings were no longer statistically significant. 
          The refinery owners refer us to the opinion of the Texarkana Court of Appeals,
which held in Austin v. Kerr-McGee Refining Co., 25 S.W.3d 280 (Tex. App. –
Texarkana 2000, no pet.), that summary judgment is proper when the scientific
literature makes only general references, or does not connect the alleged carcinogen
with the specific disease involved in the case at issue. Id. at 288. Here, having held
that the study was not statistically significant, we need not determine whether it was
overly broad and thus inapplicable when it referred to “lung cancer” as opposed to
“bronchial alveolar carcinoma,” the specific type of lung cancer that caused Daniels’s
death.
          2.       Italian Refinery Workers - 1989



          This study examined the mortality rate of 1,595 males workers employed in one
of the largest Italian refineries. The authors found that workers in the “moving
department” had a significantly increased mortality from all cancers and a 3.6 SMR
for lung cancer, specifically.



          Like the Chinese study, there was a follow-up to this study in 1999.


 Also like
the Chinese study, the follow-up found no risk-doubling for lung cancer.
           3.       British Workers - 1979



          This study examined 15,032 male refinery workers. The study, however, was
evaluating the effect on workers who were exposed to “crude petroleum, its fractions
and polycyclic aromatic hydrocarbons.” It did not specifically address benzene.
          The study found an SMR of 1.89 from dying of lung cancer. Besides the fact
that benzene was not addressed, the British study, like the Chinese and Italian studies,
was updated by a follow-up study in 1992, which examined 34,597 employees.


 This
follow-up reiterated no risk-doubling, statistically significant excess of
“bronchus/lung” cancer.  
          The Daniels family’s experts relied on these three epidemiological studies to
support their conclusion that benzene exposure caused Daniels’s death. None of the
studies has the Havner requisite risk-doubling; therefore, none of the studies reaches
the Havner standard of statistical significance. The Daniels family presented no
evidence of general causation. See Havner, 953 S.W.2d at 714 (holding that, if
foundational data underlying opinion testimony are unreliable, experts will not be
permitted to base opinions on that data.)
          We overrule point of error one.
Conclusion
          Proof of both general and specific causation are required to defeat a no-evidence toxic tort summary judgment. Because the Daniels family failed to present
summary judgment proof sufficient to raise a fact question concerning general
causation, we need not address their second point of error asserting that they offered
sufficient proof of specific causation. The trial court did not abuse its discretion
when it granted the refinery owners’ motion for summary judgment. We affirm the
judgment of the trial court.
 
                                                             George C. Hanks, Jr.
                                                             Justice

Panel consists of Chief Justice Radack and Justices Nuchia and Hanks.